[No. 13657. *En Banc.* January 13, 1917.]

STANDARD OIL COMPANY, *Respondent*, v. H. T. GRAVES, *as State Commissioner of Agriculture, Appellant*.[1]

CUSTOMS DUTIES—CONSTITUTIONAL RESTRICTIONS—INTERSTATE COMMERCE—OIL INSPECTION FEES. Rem. Code, § 6051 *et seq.*, exacting a remunerative inspection fee for the inspection of oils coming from another state into this state for sale, does not violate U. S. Const., art. 1, § 10, cl. 2, providing that no state shall, without the consent of Congress, "lay any imposts or duties on imports or exports, except what may be absolutely necessary for execution of its inspection laws;" since this does not refer to articles carried from one state to another, but only to foreign importations.

SAME. The act does not violate U. S. Const., art. 1, § 9, cl. 5, providing that "no tax or duty shall be laid on articles exported from any state," as this relates only to exportations to foreign countries.

COURTS—RULE OF DECISION—FEDERAL QUESTION. The decisions of the United States supreme court are controlling on the question whether oil sought to be subjected to an inspection tax was then an article of interstate commerce.

[1]Reported in 162 Pac. 558.

COMMERCE—INTERSTATE COMMERCE—OIL INSPECTION LAW. Where oil is brought into this state for the purpose of sale, Rem. Code, § 6052, providing for inspection and levying a remunerative inspection fee on all oils and gasoline "before being sold or offered for sale," does not violate U. S. Const., art. 1, § 8, cl. 3, reserving to Congress the power to regulate interstate commerce.

CONSTITUTIONAL LAW—PRIVILEGES AND IMMUNITIES—DUE PROCESS OF LAW. Rem. Code, § 6051 et seq., levying a remunerative inspection tax on all oils and gasoline "before being sold or offered for sale" does not impinge the fourteenth amendment to the Federal Constitution prohibting the abridgement of privileges and immunities of citizens or the taking of property without due process of law or the state Const., art. 1, § 3, providing for due process of law.

LICENSES—PRIVILEGE TAX—UNIFORMITY—TAXATION. Rem. Code, § 6051 et seq., levying a remunerative inspection tax on all oils and gasoline "before being sold or offered for sale" does not conflict with Const., art. 7, § 2, providing for uniformity and equality of taxation, and § 5 relating to the method of levying taxes; since these provisions refer to taxes upon property and not to taxes upon trades or to privilege or excise taxes.

SAME. The exaction of a remunerative inspection fee for the inspection of all oils and gasoline "before being sold or offered for sale" is not a tax on property, since it is to be paid only upon the contingency that the oil is sold or offered for sale.

CONSTITUTIONAL LAW—POWER OF COURTS. The courts cannot look to the purpose or motive prompting legislative action to restrain the enforcement of a law that is not unconstitutional, even though it may be unjust or unreasonable.

Appeal from a judgment of the superior court for Thurston county, D. F. Wright, J., entered May 17, 1916, in favor of the plaintiff, upon overruling a demurrer to the complaint, in an action for an injunction. Reversed.

*The Attorney General* and *L. L. Thompson, Assistant,* for appellant.

*Ballinger, Battle, Hulbert & Shorts* and *Pillsbury, Madison & Sutro,* for respondent.

MAIN, J.—The purpose of this action was to enjoin the enforcement of the oil inspection act passed by the legislature of this state. To the amended complaint, a demurrer was

interposed and overruled by the trial court.  The defendant refused to plead further and elected to stand upon his demurrer.  Thereupon a judgment was entered granting a permanent injunction restraining the defendant from enforcing the law.  From this judgment, the defendant appeals.  The facts stated in the amended complaint, sufficient to an understanding of the questions here presented, may be summarized as follows:

The respondent is a corporation, organized and existing under the laws of the state of California.  The appellant is the commissioner of agriculture of the state of Washington, and, under chapter 60, the Laws of 1913, p. 196 (Rem. Code, § 3000-1 *et seq.*), it is made his duty to enforce the state oil inspection law.  The respondent is engaged in the state of California in the business of producing and buying crude petroleum oil, and of manufacturing and refining the same, and of shipping products of such manufacture from its refineries in the state of California into the state of Washington, where the same "are sold by this plaintiff in large quantities for use and consumption in the state of Washington for illuminating, manufacturing, domestic and power purposes."  The respondent maintains in the state of Washington wharves, docks, tanks, warehouses, and other equipment necessary for the selling and distributing of oils which are shipped into this state for use and consumption.  Under the provisions of chapter 192 of the Laws of 1907, p. 413 (Rem. Code, § 6051 *et seq.*), the respondent has, for a number of years, paid the inspection fees provided for in that act, and the amount so paid is largely in excess of the reasonably necessary cost of inspecting and labeling the oils and administering the law.  From June 30, 1905, to December 31, 1914, the amount of the fees collected which were in excess of the cost of inspecting and labeling the oil and the administering of the law was $255,672.93.  Since the act of 1907 was passed, the excess fees over what was reasonably necessary for the inspection, labeling, and adminis-

tering the law has gradually increased. During the year 1914, the gross receipts from the enforcement of this law were $79,339.66. The disbursements under the law were $8,553.75, leaving a net revenue for that year of $70,785.91, which was paid into the treasury as required by the statute. It is alleged that the appellant, unless restrained, will continue to enforce the provisions of the law, and will refuse to inspect the illuminating oil, gasoline, distillate, and other volatile products of petroleum manufactured by the respondent in the state of California and shipped by it from that state into the state of Washington for sale, for use, and consumption therein, unless the respondent pays the fees required by the act. It is claimed that the law offends against certain provisions of the constitution of the United States, as well as the constitution of this state. These constitutional provisions will be hereinafter referred to and considered.

The inspection law referred to in the complaint was first passed during the legislative session for the year 1905 [Laws 1905, p. 310]. That act was amended in 1907, and will be found in chapter 192 of the Laws of 1907, p. 413 (Rem. Code, § 6051 et seq.). Section 3 (Id., § 6052) of this act provides that all gasoline, benzine, distillate or other volatile product of petroleum intended for use or consumption in this state for illuminating, manufacturing, domestic or power purposes, "before being sold or offered for sale," shall be inspected by the state oil inspector or his deputies. When the inspection is made, a certificate is to be issued, and the barrel or receptacle which contains the oil must be labeled or branded. Section 4 (Id., § 6053) of the act contains a schedule of the fees which shall be paid for the inspection. Section 6 (Id., § 6055) provides that if any person or persons, whether manufacturer, vender or dealer, or as agent or representative of any manufacturer, vender or dealer, "shall sell or attempt to sell" to any person, firm or corporation in this state, any illuminating oil, gasoline, benzine, distillate or any volatile product of petroleum, intended for

use or consumption within this state, that has not been inspected and branded according to the provisions of the. act, "shall be guilty of a misdemeanor." By the Laws of 1913, chapter 60, p. 196 (Rem. Code, § 3000-1 *et seq.*), it was made the duty of the commissioner of agriculture to exercise all the powers and perform all the duties which, by the law of 1907, were vested in, and required to be performed by, the state oil inspector.

The first question is whether the oil inspection law offends against article 1, section 10, clause 2, of the Federal constitution, which provides that no state shall, without the consent of Congress, "lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws; . . ." This constitutional provision, as construed by the Federal supreme court, does not refer to articles carried from one state into another, but only to articles imported from foreign countries into the United States. *Woodruff v. Parham,* 8 Wall. 123; *Brown v. Houston,* 114 U. S. 622; *Patapsco Guano Co. v. North Carolina Board of Agriculture,* 171 U. S. 345.

Under the facts stated in the amended complaint, the oil was not imported from a foreign country into the United States, but was carried from one state into another, and the constitutional provision referred to has no application.

The second question is whether article 1, section 9, clause 5, of the Federal constitution, which provides that "no tax or duty shall be laid on articles exported from any state," can be invoked by the respondent. This mandate relates only to exportations to foreign countries, and is designed to give immunity from taxation to property that is in the actual course of such exportation. *Dooley v. United States,* 183 U. S. 151; *United States v. Hvoslef,* 237 U. S. 1, Ann. Cas. 1916A 286.

The third question is whether the statute required the inspection to be made during the time that the oil was an article in interstate commerce. Article 1, section 8, clause 3, of. the

Federal constitution provides that the Congress of the United States shall have power "to regulate commerce with foreign nations and among the several states and with the Indian tribes." The determination of this question involves a consideration of the question whether the oil owned by the respondent in this state, when it was sought to be subjected to the inspection tax, was then an article in interstate commerce. In the solution of this question, the decisions of the United States supreme court are controlling. In *Bacon v. People of Illinois*, 227 U. S. 504, grain had been shipped by the original owners, who were residents of the southern and western states, under contracts for its transportation to New York, Philadelphia, and other eastern cities. These contracts reserved to the owners the right to remove the grain from the cars at Chicago "for the mere temporary purposes of inspecting, weighing, cleaning, clipping, drying, sacking, grading or mixing, or changing the ownership, consignee or destination" thereof. While the grain was in transit, it was purchased by Bacon, the plaintiff in error, who succeeded to the rights of the vendors, under the contracts of shipment. At the points of destination, Bacon was represented by agents, through whom he disposed of the grain and other commodities on the eastern markets. The grain there in question was purchased by him solely for the purpose of being sold in this way, and with the intention to forward it according to the shipping contracts. It was not his intention to dispose of it in Illinois. Upon the arrival of the grain in Chicago, Bacon availed himself of the privilege reserved, and removed it from the cars to his private elevator. This removal was for the sole purpose of inspecting, weighing, grading, mixing, etc., and not for the purpose of changing its ownership, consignee or destination. All grain remained in the elevator only for such time as was reasonably necessary for the purposes mentioned, and immediately after these purposes had been accomplished, it was turned over to the railroad companies, and forwarded by them to the eastern

cities, in accordance with the original contract. No part of the grain was sold or consumed in Illinois. While it was in Bacon's elevator in Chicago, it was, by the board of assessors of Cook county, Illinois, assessed, and a tax levied thereon. Upon these facts, it was held that the grain, when the tax was assessed, was not the subject of interstate commerce, because the property was in the state of Illinois for purposes deemed by the owner to be beneficial to himself, and was not in actual transportation. It was there said:

"But neither the fact that the grain had come from outside the state nor the intention of the owner to send it to another state and there to dispose of it can be deemed controlling when the taxing power of the state of Illinois is concerned. The property was held by the plaintiff in error in Chicago for his own purposes and with full power of disposition. It was not being actually transported and it was not held by carriers for transportation. The plaintiff in error had withdrawn it from the carriers. The purpose of the withdrawal did not alter the fact that it had ceased to be transported and had been placed in his hands. He had the privilege of continuing the transportation under the shipping contracts, but of this he might avail himself or not as he chose. He might sell the grain in Illinois or forward it as he saw fit. It was in his possession with the control of absolute ownership. He intended to forward the grain after it had been inspected, graded, etc., but this intention, while the grain remained in his keeping and before it had been actually committed to the carriers for transportation, did not make it immune from local taxation. He had established a local facility in Chicago for his own benefit and while, through its employment, the grain was there at rest, there was no reason why it should not be included with his other property within the state in an assessment for taxation which was made in the usual way without discrimination. *Woodruff v. Parham, supra; Brown v. Houston, supra; Coe v. Errol, supra; Pittsburgh & Southern Coal Co. v. Bates,* 156 U. S. 577; *Diamond Match Co. v. Ontonagon, supra; American Steel & Wire Co. v. Speed, supra; General Oil Co. v. Crain, supra.*

"The question, it should be observed, is not with respect to the extent of the power of Congress to regulate inter-

state commerce, but whether a particular exercise of state power in view of its nature and operation must be deemed to be in conflict with this paramount authority. *American Steel & Wire Co. v. Speed, supra,* pp. 521, 522. Thus, goods within the state may be made the subject of a nondiscriminatory tax though brought from another state and held by the consignee for sale in the original packages. *Woodruff v. Parham, supra.* In *Brown v. Houston, supra,* the coal on which the local tax was sustained had not been unloaded, but was lying in the boats in which it had been brought into the state and from which it was offered for sale. In *Pittsburgh & Southern Coal Co. v. Bates, supra,* coal had been shipped from Pittsburgh to Baton Rouge in barges which, to accommodate the owner's business, had been moored about nine miles above the point of destination. The coal while remaining on the barges under these conditions was held subject to taxation. In *General Oil Co. v. Crain, supra,* the oil which had been brought from Pennsylvania to Memphis, a distributing point, was held in tanks, one of which was kept for oil for which orders had been received from Arkansas, Louisiana and Mississippi prior to the shipment from Pennsylvania, and which had been shipped especially to fill such orders. The tank was marked 'Oil Already Sold in Arkansas, Louisiana and Mississippi.' The local tax upon this oil, which remained in Tennessee only long enough (a few days) to be properly distributed according to the orders, was sustained.

"In the present case the property was held within the state for purposes deemed by the owner to be beneficial; it was not in actual transportation; and there was nothing inconsistent with the Federal authority in compelling the plaintiff in error to bear with respect to it, in common with other property in the state, his share of the expenses of the local government."

We have quoted thus copiously from that opinion, because it seems to fully and clearly set forth the views of the court, and reviews the previous holdings. In *General Oil Co. v. Crain,* 209 U. S. 211, it was sought to subject certain oils in the tanks or containers to the payment of the oil inspection tax of that state. It was there contended that the oil in the tanks mentioned was in transit from the place of

manufacture, in Pennsylvania, to the place of sale, in Arkansas, and other southwestern states, and that the delay at Memphis was merely for the purpose of separation, distribution and reshipment, and was for no longer time than required by the nature of the business and the exigencies of transportation. The oil at Memphis, Tennessee, was placed in two tanks, when it was removed from the tank cars in which it had been shipped from Pennsylvania. In one tank was kept the oil for which orders had been received from the states above mentioned before its shipment from the manufacturing plants, and which had been shipped to fill such orders. This oil was unloaded at Memphis only for the purpose of distribution into smaller vessels to meet the requirements of such orders, and it was kept separate from oils for sale in Tennessee. It remained in Tennessee only long enough (a few days) to be properly distributed according to the orders therefor. In another tank, or vessel, was the oil to be sold in the states mentioned, but for which no orders, at the time of shipment from the manufacturing plants, had been received. The oil in this tank was marked "Oil to be sold in Arkansas, Louisiana and Mississippi," and was kept separate and apart from all other oil until required to supply orders to plaintiff's customers in those states. The legislature of the state of Tennessee had previously passed an oil inspection law which is strikingly similar to the law of this state. The question there was whether the oils in the two tanks mentioned were subject to the inspection tax provided by the Tennessee law. It was there claimed that the fees were unreasonable and exorbitant for the services performed, and very much greater than necessary to provide for inspection, and that, after payment of the salaries and other expenses incident to inspection, a surplus of many thousand dollars went annually into the treasury. It was there held that the oil in both tanks had lost its character as an article in interstate commerce, and was subject to the power of the state to tax, because the oil had been brought

to a state of rest in the state of Tennessee, and was entitled to the protection of the laws of that state, and was placed in the tanks for the business purposes of the owner. It was there said:

"The company was doing business in the state, and its property was receiving the protection of the state. Its oil was not in movement through the state. It had reached the destination of its first shipment, and it was held there, not in necessary delay or accommodation to the means of transportation, as in *State etc. v. Engle, supra,* but for the business purposes and profit of the company. It was only there for distribution, it is said, to fulfill orders already received. But to do this required that the property be given a locality in the state beyond a mere halting in its transportation. It required storage there—the maintenance of the means of storage, of putting it in and taking it from storage. The bill takes pains to allege this. 'Complainant shows that it is impossible, in the coal oil business, such as complainant carries on, to fill separately each of these small orders directly from the railroad tank cars, because of the great delay and expense in the way of freight charges incident to such a plan, and for the further reason that an extensive plant and apparatus is necessary, in order to properly and conveniently unload and receive the oil from said tank cars, and it would be impracticable, if not impossible, to have such apparatus and machinery at every point to which complainant ships said oil.'

"This certainly describes a business—describes a purpose for which the oil is taken from transportation, brought to rest in the state and for which the protection of the state is necessary, a purpose outside of the mere transportation of the oil. The case, therefore, comes under the principle announced in *American Steel & Wire Co. v. Speed,* 192 U. S. 500.

"We have considered this case so far in view of the cases which involve the power of taxation. It may be that such power is more limited than the power to enact inspection laws. *Patapsco Guano Co. v. Board of Agriculture,* 171 U. S. 345, 356. The difference, if any exists, it is not necessary to observe. The cases based on the taxing power show the contentions of plaintiff in error are without merit; in

other words, show that its oil was not property in interstate commerce.

"As our conclusion is that no constitutional right of the oil company was violated by the enforcement of the law of 1899, it follows that no error prejudicial to the company was committed by the supreme court of Tennessee, and, for the reasons stated, its judgment is affirmed."

According to the facts stated in the amended complaint in the present case, the oil was brought into this state for the purpose of sale. It is not alleged in the complaint that the inspection was sought to be made while it was still in transit and before it came to a state of rest within the state. The inspection law, as above indicated, only requires that the oil be inspected and tested before it is sold or offered for sale. If the grain in the *Bacon* case, while it was in the elevator in Chicago, was no longer in interstate commerce, and the oil in the *General Oil Co.* case had lost its character of interstate commerce while in the tanks at Memphis, Tennessee, it would seem to follow that a law which requires that the oil be inspected before it is "sold or offered for sale" does not interfere with interstate commerce. In *Spaulding v. Adams County*, 79 Wash. 193, 140 Pac. 367, four carloads of buggies had been shipped from Grinnell, Iowa, to Ritzville, this state. The buggies were shipped in a dismantled condition, and were unloaded from the cars in which they arrived, and carried to a warehouse rented by the appellants, where they were reassembled and kept until sold. On the arrival of the buggies in the city of Ritzville, the corporate authorities of Adams county caused them to be valued for assessment purposes, and caused a tax to be levied thereon. One of the questions in the case was whether the buggies had lost their character of interstate commerce at the time the assessment was made. The case was here upon the findings, and there was a controversy over the construction of certain words used therein. Spaulding contended that, according to the findings, the assessment was made

prior to the time when the property was unloaded from the cars in which it had been carried into the state. The county contended that, according to its construction of the findings of the trial court, the assessment was not made until after the buggies had been unloaded from the cars. Speaking of the effect, if the findings were given the construction contended for by Spaulding, the court held that, even under that construction, the buggies had lost their character of interstate commerce. It was said:

"But we think the rule would not be different were the appellant's construction of the findings the correct construction. The property had reached its destination. It had come to its place of rest for final disposal and use, and was to remain there until finally disposed of by the owner. As such, we think it constituted a part of the mass of the general property of the county, even while on the cars, and was thus subject to taxation under the provision of the statute quoted, since it was the intention of the owners to take it to a place of business to be temporarily occupied for its sale."

In the respondent's brief, the case of *Foote & Co. v. Maryland*, 232 U. S. 494, is much relied upon to support the judgment of the trial court, and the suggestion is made that that case modifies or overrules the *General Oil Co.* case, *supra*. In that case, the plaintiffs, D. E. Foote & Company, Incorporated, were engaged in the business of packing oysters at Baltimore, Maryland. The oysters were taken from the waters of Maryland, Virginia, and New Jersey. The legislature of the state of Maryland had passed a law for the inspection of oysters, and it was made the duty of the inspectors to inspect all oysters in the district to which they were respectively assigned. It was there held that, as to the oysters shipped from Virginia and New Jersey, the inspection law placed a burden upon interstate commerce. The question in that case was whether articles in interstate commerce could be required to pay an inspection fee which was greatly in excess of the inspection cost. It was recognized that the state had the right to inspect articles in interstate

commerce and require an inspection fee, when the fees collected did not unreasonably exceed the cost of the administration of the law. In that case, the *General Oil Co.* case, though decided only a few years previous, was not referred to. Neither was there any discussion as to when an article is, and when it is not, in interstate commerce. It seems from the opinion to have either been assumed or conceded that the inspection law of Maryland covered interstate commerce, so far as the oysters coming from other states were concerned. The question considered in the *General Oil Co.* case was, when had an article lost its character of interstate commerce and become a part of the mass of the property of the state. It seems obvious that the court, in the *Foote* case, did not intend to overrule the *General Oil Co.* case without referring to it, and without discussing the question involved in that case. Speaking of the excess of the inspection fees collected over the cost of inspecting the oysters, the court observed that the excess collected "may have been valid as a tax on property in Maryland, but was a burden on interstate commerce when levied upon oysters coming from other states." We are aware that the supreme court of Ohio, in *Castle v. Mason*, 91 Ohio St. 296, 110 N. E. 463, and the supreme court of North Dakota, in *Bartles Northern Oil Co. v. Jackman*, 29 N. D. 236, 150 N. W. 576, have placed a different construction upon the *Foote* case from that which we have. Both of these courts construed the *Foote* case as authority for holding that an oil inspection law passed by the legislatures of the two respective states was an unlawful interference with interstate commerce. While we entertain great respect for the opinions of both the supreme court of Ohio and of North Dakota, we are yet constrained to say that, it seems to us, those courts have not correctly interpreted the holding in the *Foote* case. The supreme court of Minnesota, in *State v. Bartles Oil Co.* (Minn.), 155 N. W. 1035, declined to follow the construction placed upon the *Foote* case by the supreme courts of Ohio and North Dakota.

That court was of the opinion that the *Foote* case did not overrule the *General Oil Co.* case. Upon the question of interstate commerce, as already indicated, we think that the oil inspection law of this state does not interfere with the paramount authority of Congress to regulate such commerce.

The fourth question is whether section 1 of the 14th amendment of the Federal constitution, which provides that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor deprive any person of life, liberty, or property, without due process of law; or article 1, section 3, of the constitution of the state of Washington, which provides for due process of law, are impinged by the enforcement of the oil inspection law. The law does not abridge the privileges or immunities of citizens of the United States, because it applies equally to all persons selling or offering for sale the articles mentioned in the statute, whether such persons be citizens of this state or other states of the Union. As to due process of law, no authorities are cited which would show that the enforcement of the law conflicts with that provision of the constitution, and we know of none which so hold. Neither is any reason suggested which would justify such a holding.

The fifth question is whether the oil inspection tax provided for conflicts with article 7, section 2, of the state constitution, which provides for "uniformity and equality" of taxation; or section 5, of the same article, which provides that "no tax shall be levied except in pursuance of law; and every law imposing a tax shall state distinctly the object of the same, to which it only shall be applied." It has become the settled doctrine of this state that the provisions of the state constitution, found in article 7, relative to taxation, refer to taxes upon property, and have no application to taxes upon trades, professions, or occupations, or to privilege or excise taxes. *Fleetwood v. Read,* 21 Wash. 547, 58 Pac. 665, 47 L. R. A. 205; *Stull v. De Mattos,* 23 Wash. 71, 62 Pac. 451, 51 L. R. A. 892; *In re Garfinkle,* 37 Wash. 650, 80 Pac.

188; *Seattle v. King,* 74 Wash. 277, 133 Pac. 442; *State v. Sheppard,* 79 Wash. 328, 140 Pac. 332; *State v. Collins, post* p. 310, 162 Pac. 556.

The sixth question is, does the oil inspection law impose a tax upon property, or provide for a tax upon a business, occupation, or an excise tax. If it is a tax on property, the law could not be sustained because of the lack of uniformity and equality. On the other hand, if it is a tax on the business or occupation or privilege, or an excise tax, the law is not invalid unless there is some constitutional provision limiting the amount of such taxation.

In *State v. Clark,* 30 Wash. 439, 71 Pac. 20, it was held that the inheritance tax law, which provided for the taxation of inheritances, was not invalid by reason of exempting some and laying proportional taxes on others, since the charges provided for were upon the passing of the estate by succession, and not a tax upon property. It was there said:

"The objection urged here, that the statute is in conflict with §§ 1, 2, and 5 of article 7 of the state constitution, relating to taxation, is not tenable, because the charge made upon the passing of the estate is not a tax on property. It is an impost or excise on the right to pass the estate and the privilege of the devisee to take. That it is not within the provision relating to the tax on property is well settled by practically unanimous authority."

In *State v. Sheppard,* 79 Wash. 328, 140 Pac. 332, the court considered an act of the legislature fixing a license fee to be collected from peddlers. It was there held that this license fee, or tax, was not a property tax.

The constitution of the United States provides:

"No capitation or other direct tax shall be laid, unless in proportion to the census or enumeration hereinbefore directed to be taken." Const., art. 1, § 9.

The Federal supreme court, in construing this section, holds that the direct tax there provided for is a property tax, as distinguished from an impost, excise, or tax on a

business, occupation, or profession. In *Thomas v. United States*, 192 U. S. 363, that court had before it an act of Congress requiring the payment of a stamp tax upon memorandums or contracts of sale of certificates of stock. In answer to the contention that this was a property tax, it was said:

"The sale of stocks is a particular business transaction in the exercise of the privilege afforded by the laws in respect to corporations of disposing of property in the form of certificates. The stamp duty is contingent on the happening of the event of sale, and the element of absolute and unavoidable demand is lacking. As such it falls, as stamp taxes ordinarily do, within the second class of the forms of taxation."

In *Patton v. Brady*, 184 U. S. 608, it was held that an act of Congress providing for a tax of twelve cents per pound upon tobacco and snuff, however prepared, manufactured and sold, or removed for consumption or sale, was not a direct tax, and therefore was not in conflict with the Federal constitution. It was there said:

"It is true other counsel in their brief have advanced a very elaborate and ingenious argument to show that this is a direct tax upon property which must be apportioned according to population within the rule laid down in the *Income Tax* cases, but, as we have seen, it is not a tax upon property as such but upon certain kinds of property, having reference to their origin and their intended use."

The payment of the fee required by the oil inspection act is not an absolute and unavoidable demand, but is to be paid only upon the contingency that the oil is sold or offered for sale. If neither the inheritance law nor the license law imposes a tax on property, and the corporation stamp tax, and the tobacco and snuff tax are not direct taxes, it would seem to follow that the oil inspection law did not impose a tax upon property as such, but only upon the privilege of selling or disposing of such property. Whether it is called an occupation tax, a tax upon the right to sell, or an excise

tax, is immaterial. If the tax is not a property tax, there is no constitutional restraint upon the power of the legislature to require it. The state constitution is a limitation upon the actions and powers of the legislature, instead of a grant of power. So far as the power of the legislature is not limited by the constitution, it is unrestrained. In *Fleetwood v. Read, supra,* upon this question, the court observed:

". . . the state constitution is a limitation upon the actions and powers of the legislature instead of a grant of power, that the power of the legislature to tax trades, professions and occupations is, in the absence of constitutional restriction, a matter within its absolute control and resting entirely in sound legislative discretion."

In *State v. Sheppard, supra,* it was said:

"The only taxes mentioned in article 7, or elsewhere in the constitution are property taxes, and from the reading of that article as a whole, we are of the opinion that the limitation here sought to be invoked is no more applicable to this tax than the equality rule is applicable to the inheritance tax. This tax, like the inheritance tax, finds no mention in the constitution, and like the inheritance tax, is exacted by virtue of the inherent power of the legislature, unrestrained, we think, by any constitutional rule of the exercise of that power."

It may be true that, if the law is to be regarded purely as an exercise on the part of the legislature of the police power, the inspection fees must be limited to what is reasonably necessary to pay the cost of inspection, labeling, and administering the law, but upon this no opinion is expressed. Even if the law could not be sustained as an exercise of the police power, it yet is the duty of the court to sustain it under the power of the legislature to levy a tax not upon property, since it is properly sustainable under that power.

In *Stull v. De Mattos,* 23 Wash. 71, 62 Pac. 451, 51 L. R. A. 892, it was held that an ordinance charging an auctioneer's license was valid as an exercise of the taxing power,

even though it could not be upheld as a legitimate exercise of the power to regulate business.

In *General Oil Co. v. Crain, supra*, the oil inspection law of the state of Tennessee was considered as one involving the power of taxation. The court cannot concern itself with the purpose or motive which prompted legislative action, so long as that action does not conflict with any constitutional mandate. The enforcement of a law, passed in the exercise of power possessed by a coordinate branch of the government, cannot be restrained, even though the court may believe that the law is unjust, unreasonable, or, as a matter of public policy, unwise.

In *McCray v. United States*, 195 U. S. 27, the following observations appear:

"It is, however, argued if a lawful power may be exerted for an unlawful purpose, and thus by abusing the power it may be made to accomplish a result not intended by the Constitution, all limitations of power must disappear, and the grave function lodged in the judiciary, to confine all the departments within the authority conferred by the Constitution, will be of no avail. This, when reduced to its last analysis, comes to this, that, because a particular department of the government may exert its lawful powers with the object or motive of reaching an end not justified, therefore it becomes the duty of the judiciary to restrain the exercise of a lawful power wherever it seems to the judicial mind that such lawful power has been abused. But this reduces itself to the contention that, under our constitutional system, the abuse by one department of the government of its lawful powers is to be corrected by the abuse of its power by another department.

"The proposition, if sustained, would destroy all distinction between the powers of the respective departments of the government, would put an end to that confidence and respect for each other which it was the purpose of the Constitution to uphold, and would thus be full of danger to the permanence of our institutions. . . .

"It is, of course, true, as suggested, that if there be no authority in the judiciary to restrain a lawful exercise of

power by another department of the government, where a wrong motive or purpose has impelled to the exertion of the power, that abuses of a power conferred may be temporarily effectual. The remedy for this, however, lies, not in the abuse by the judicial authority of its functions, but in the people, upon whom, after all, under our institutions, reliance must be placed for the correction of abuses committed in the exercise of a lawful power."

On one or two of the questions herein considered, other than the question of interstate commerce, there is dictum in *State v. Bartles Oil Co., supra,* and a holding in *Collins v. Morris,* 97 Kan. 264, 155 Pac. 51, not in harmony with the views we have expressed. To review those cases would unnecessarily extend this opinion, which has already seemingly become disproportionate in length. Suffice it to say that, in our opinion, the conclusions we have reached are not only sustained by the authorities, but have the better reason in their support.

The judgment will be reversed, and the cause remanded to the superior court with direction to dismiss the action.

ELLIS, C. J., MOUNT, PARKER, CHADWICK, MORRIS, FULLERTON, and HOLCOMB, JJ., concur.