[No. 17791. Department One. June 16, 1923.]

# UNION OIL COMPANY OF CALIFORNIA, *Appellant*, v. THE STATE OF WASHINGTON *et al., Respondents.*[1]

COURTS (38)—RULE OF DECISION—FEDERAL COURTS. Under the rule of *stare decisis*, this court is as much bound to follow, on a Federal question, the rule of decisions of the supreme court of the United States arising in other states as a decision on writ of error to this court.

SAME (38). Decision of the Federal supreme court that the state oil inspection law of 1907 (Ch. 192, p. 412) was unconstitutional as imposing a direct burden on interstate commerce, is not conclusive that the law was absolutely unconstitutional as to oil not in interstate commerce, the Federal supreme court having since extended the exemption from fees to oils no further than "while the same are in the original receptacles or containers."

COMMERCE (1, 5)—INSPECTION (1)—INTERSTATE COMMERCE—OIL INSPECTION FEES—ORIGINAL PACKAGES. Although petroleum products destined for local sales and distribution remained in the tank ship at the time of inspection and was then a part of interstate commerce, state inspection fees may be collected thereon, if the method of inspection while they were in such tanks was followed at the request and with the consent of the company, which, by such bulk inspection, effected a great saving over the fees for products held in bulk and shipped in small lots to distributors.

COMMERCE (1, 5)—INSPECTION (1)—OIL INSPECTION FEES. The state has the right to tax petroleum products shipped to, and intended for, the shippers own use in this state.

SAME (1, 5)—INSPECTION (1)—INTERSTATE COMMERCE—PRODUCTS FOR RESHIPMENT. Oils intended for shipment outside of the state, and held at a storage depot in this state, come to rest in this state, and are subject to the state inspection and tax, the same as oils for local distribution and sale.

SAME (1, 5)—INSPECTION (1)—OIL INSPECTION FEES—RECOVERY— GOODS IN INTERSTATE COMMERCE. Oils shipped to a depot outside the state, for distribution in this state, and coming to rest and inspected and taxed at that point, cannot be again taxed on reshipments to this state in the original containers.

Appeal from a judgment of the superior court for Thurston county, Wright, J., entered October 26, 1922,

[1]Reported in 216 Pac. 22.

upon findings in favor of the defendants, in an action to recover oil inspection fees paid under protest, tried to the court. Modified.

*Stratton & Kane,* for appellant.

*The Attorney General (E. W. Anderson,* of counsel), for respondents.

Holcomb, J.—This action was brought to recover $57,333.45, the total amount of fees paid for inspection by respondents of petroleum products between July 18, 1916, and April 30, 1919, under the oil inspection law of 1907 (Laws of 1907, ch. 192, p. 412).

That law having been attacked as unconstitutional under the commerce clause of the Federal constitution, in a suit by the Standard Oil Company, was sustained by this court. *Standard Oil Co. v. Graves,* 94 Wash. 291, 162 Pac. 558. It then went to the Federal supreme court, where it was held unconstitutional as imposing a direct burden upon interstate commerce. *Standard Oil Co. v. Graves,* 249 U. S. 389.

Another and this action were then brought to recover inspection fees. The other case came before this court first, and was decided in *Shell Co. of California v. State,* 113 Wash. 632, 194 Pac. 835. Demurrers by respondents to the complaints in that and in this cause were overruled, respondents refused to further plead, and judgments were thereupon entered in favor of plaintiffs.

Stipulations were made between the parties that the result in this case should abide that in the *Shell Company* case. Upon the remittitur in that case going down, in accordance therewith, the demurrer in this case was sustained, but allowing appellant to file an amended complaint "so as to show that some or all of the payments which it made were made upon petroleum prod-

ucts while they were in interstate commerce." Appellant thereafter served and filed its second amended complaint, upon which issue was joined, and after trial by the court, findings, conclusions and judgment were granted respondents.

Upon appeal, to reverse the judgment, appellants contend, chiefly, that the decision by the supreme court of the United States in the *Graves* case, *supra,* is binding and conclusive upon the state of Washington, to the effect that the oil inspection law of 1907 is unconstitutional in so far as all of the petroleum products brought into the state by appellant are concerned, not only under the rule of *stare decisis,* but under the doctrine of *res adjudicata.* And that, since the *Graves* decision is binding and conclusive upon respondents, a different rule cannot be applied to this appellant, as such a construction would result in class legislation, in violation of both the letter and spirit of the constitution. It is further contended that, in any event, the evidence here shows that all of the products upon which appellant paid inspection fees were in interstate commerce when the inspections were made, and that the inspections were consequently illegal.

The principal questions raised herein were decided in the *Shell Company* case, *supra,* adversely to appellant's contention.

Contrary to the contention of appellant, the Federal supreme court did not decide the oil inspection law of 1907 absolutely void, as was said of it in a later decision, *Texas Co. v. Brown,* 258 U. S. 466.

"That decision, however, extended the exemption from such fees of goods brought from state to state, no further than 'while the same are in the original receptacles or containers in which they are brought into the state' (pp. 394, 395) ; and so it was interpreted in *Askren v. Continental Oil Co.,* 252 U. S. 444, 449."

And so we interpreted the *Graves* case in the *Shell Company* case, basing our interpretation upon the *Askren* case, *supra,* and the *Brown* case, *supra,* which had then been decided by an inferior Federal court, and reported in 266 Fed. 577. The last is the case decided by the supreme court, 258 U. S. 466, from which we quoted.

The *Askren* case, *supra,* was again before the United States supreme court, after a final decree in *Bowman v. Continental Oil Co.,* 256 U. S. 642, 65 Law Ed. 1139 (Bowman having succeeded Askren in official capacity). There the severability of interstate and domestic commerce for the purpose of license and excise taxes was again discussed and decided.

Under the rule of precedent, or *stare decisis,* we are as much bound to follow the decisions of the supreme court of the United States in the *Askren, Bowman* and *Brown* cases, *supra,* as we are to follow the decision in the *Graves* case.

Nor can we consider that the *Graves* case is *res adjudicata* any more than we do in the *Shell Company* case. We still believe that the decision in the *Shell Company* case was right, notwithstanding criticism by appellant.

Nor does the record sustain the contention of appellant that in the present action *all of the products* upon which the fees were levied and paid were imported and sold to customers in the original containers, and without indefinite storage.

In this case inspections were made at Seattle, in this state, and at Willbridge, Oregon. It appears that none of the oil received at the Seattle oil depot was imported for sale to customers in the original container. There were, however, three classes of products inspected at Seattle, namely: (1) oil intended for local sale and

distribution to customers of appellant; (2) oils intended for use of the company itself; and (3) oils intended for reshipment from the Seattle oil depot to points in Alaska, Idaho, Montana and South Dakota.

(1) As to petroleum products intended for local distribution and sale, it is urged that inspection was made and fees collected while the oil remained in the tank cars, and prior to the termination of the interstate voyage. The same contention was urged in *Texas Co. v. Brown, supra,* wherein the United States supreme court held that, even though petroleum products destined for local sale and distribution were sold in the tank cars and a part of interstate commerce, the fees could ·legally be collected for the inspection of such products, if this method of inspection was followed with the consent of the company. In that case the court said:

".  .  .  . all plaintiff's supplies for that state (Georgia) are brought from points in other states, principally by rail in tank cars owned by plaintiff. .  .  . Plaintiff has thirty-four local agencies or distributing stations at different points in the state, at which are stationary storage tanks for oil and gasolene respectively, pumps and other apparatus for transferring the products from tank cars to storage tanks, and either a railroad siding,. or (in a few cases) a private track in proximity to the storage tanks. .  .  . As a rule, and as a part of plaintiff's own system, as soon as one of the tank cars is started from the point of origin outside the state, a request for inspection, together with a check for the inspection fees, is forwarded by plaintiff to the local inspector nearest the point of destination, notifying him that the shipment is en route, and requesting him to give it immediate attention upon arrival. Upon its arrival the local agent notifies the inspector, who thereupon, in compliance with the previous request, inspects the oil or. gasolene by taking a sample from the tank car, after

which its contents are conveyed to and into the storage tank, and then distributed and sold to patrons, either directly from the tank or by means of the delivery wagons. In some instances, involving substantial quantities, but only a small proportion of the whole,— less than five per cent,—plaintiff sells tank cars of gasolene and kerosene direct to its customers in Georgia, making interstate shipment direct to customer's address.''

As to the last mentioned class of products the court held the fees imposed thereon uncollectible, since they were shipped in original receptacles or containers direct to customers. But as to inspection fees imposed upon those products to be held in tanks or containers for further distribution, the court said:

''The practice, uniformly followed, with plaintiff's consent, indeed, at its request and for its convenience, has been to inspect the oil and gasolene arriving at its distributing stations while remaining in the tank cars, with resulting immediate liability for the fees; otherwise as to direct deliveries to its customers buying in tank-car lots. . . . Ordinarily, unless a loaded car be used for indefinite storage, or as a distributing tank for local sales (nothing of either kind appears in the case), it remains in interstate commerce until unloaded, and the agents of the state may not lawfully subject its contents to the inspection charges until transferred to the storage tank, unless with plaintiff's consent. . . .

''The evidence strongly tends to show that it may be more convenient to plaintiff that inspection before unloading of tank cars, as heretofore practiced, be continued; and there is no legal objection to this, if done with plaintiff's free consent. Aside from this, the authority of defendants to tax the products or their storage or sale commences when they have come to rest; ordinarily, when transferred from the tank car to the storage tank and added to plaintiff's stock-in-trade kept therein for local distribution and sale.''

The same conditions obtain in this case. It appears from the evidence that the practice that generally obtained at the Seattle office was that, shortly before the oil tank steamer was due, it was the custom of appellant's employees to notify the state oil inspector the date of the expected arrival of the ship. If the ship arrived in the daytime, samples of the oil would be taken therefrom, either by the quartermaster of the ship, employees of the company at the dock, or representatives of the state oil inspector. As soon as these samples were taken the ship was immediately unloaded. The oil inspector would then proceed to test the samples theretofore taken. Appellant, if the test was satisfactory, would pay the inspection fee based on the number of gallons contained in the ship. If the ship arrived in the nighttime, samples would be taken from the tanks of the ship by appellant's employees, or members of the crew of the ship, and placed in the company's warehouse. The oil inspector or his representative would then come down the following day and make the tests. The unloading of the ship was not delayed until after inspection had been made, but was commenced as soon as the samples were taken from the cargo. Under the schedule of fees provided by ch. 192, Laws of 1907, p. 415, § 4, the inspection charges were much less where the product was offered for inspection in carload lots or over, and it was therefore greatly to the advantage of appellant to have its products inspected in large quantities. The bulk of the products held in Seattle in storage were afterwards shipped in small lots to customers and distributing stations throughout the state. Numerous inspections in small quantities at distributing points would have greatly increased the aggregate fees to be paid. In fact, appellant's district manager objected, in writing to the

state oil inspector, to any change in the system of sampling and inspecting in large lots.

We are therefore of the opinion that, as to the inspections at Seattle, the same situation obtained as existed in *Texas Co. v. Brown, supra,* and that the inspection as made was so made with the consent of appellant, and seemingly the fees therefor were legally payable.

(2) As to the products intended for appellant's own use, the right of the state to tax the same is expressly upheld in *Bowman v. Continental Oil Co.,* 256 U. S. 642, 65 Law Ed. 1139.

(3) As to the inspection of products intended for shipment outside of the state, there is nothing in the second amended complaint as to these, nor does appellant in its brief urge the invalidity of inspection fees because levied upon this particular class of products. As to the right of the state to tax these products after arrival at the Seattle oil depot, we think the situation is no different than that considered in *General Oil Co. v. Crain,* 209 U. S. 211, and *Champlain Realty Co. v. Brattleboro,* U. S. Adv. Ops. 1922-23, p. 165.

Under these decisions, oils intended for such shipment do come to rest within the state, and the situation as to them was no different than that when they were intended for local distribution and sale.. However, the evidence of appellant does not show the specific proportion intended of the products subsequently shipped to other states.

The sum of $4,111.34 was collected by the state for inspection of petroleum products while in storage in the state of Oregon prior to shipment to customers in the state of Washington. It was shown that $3,213.81 was collected on oil shipped to customers, and $897.53

was collected on oil shipped by appellant to its own agents in this state.

Respondent contends that those products were inspected in Oregon by and with the consent of appellant, and that therefore it cannot complain; and furthermore that appellant did not protest the payment of these fees. It appears that the fees, though nominally paid under protest, were not paid, according to respondents, under such duress, force or coercion as to constitute an involuntary payment, and respondents contend that a tax voluntarily paid cannot be recovered back.

We are of the opinion that appellant was at all times protesting against the exaction of any fees for inspection upon goods which were actually in interstate commerce. These goods in the state of Oregon, on which fees were collected to the amount of $3,213.81, were goods which had come to rest in the state of Oregon. While they were afterwards shipped to customers in the state of Washington, there is nothing to show that they were not shipped in the original containers. It must be presumed, therefore, that they were in interstate commerce when inspected and taxed, and the fees therefore cannot be sustained.

To that extent the judgment is therefore modified, so that appellant will recover back the sum of $3,213.81, with interest thereon at the legal rate from the dates of payment.

Appellant, having recovered a more favorable judgment in this court, will be allowed costs on appeal.

Except as modified, the judgment is affirmed.

MAIN, C. J., MACKINTOSH, BRIDGES, and MITCHELL, JJ., concur.