[No. 20498. *En Banc.* February 25, 1927.]

THE STATE OF WASHINGTON, *on the Relation of E. F. Banker, Plaintiff,* v. C. W. CLAUSEN, *State Auditor, Respondent.*[1]

[1] CONSTITUTIONAL LAW (39) — STATES (27) — ENCROACHMENT ON LEGISLATURE—APPROPRIATIONS—OPERATION AND EFFECT — DIVERSION—REVIEW. Chapter 1, Laws 1927, appropriating a specified sum for the purpose of paying the expenses of the twentieth legislature, confines the use of the money to the purposes stated, and any attempt to divert it may be reviewed by the courts; and a joint resolution of the House and Senate requiring payment therefrom of five dollars a day to each legislator for his expenses in attending is such a diversion.

[2] STATES (10)—STATUTES (54)—COMPENSATION OF STATE LEGISLATURES—PRINCIPLES AND MAXIMS OF CONSTRUCTION. Const. Art. II, § 23, providing that each member of the legislature shall receive for his services five dollars for each day's attendance and ten cents for each mile traveled in going and coming to the place of meeting, under familiar rules including particularly the rule that *expressio unius est exclusio alterius,* must be construed to allow five dollars per day, only, for services, and the mileage allowance, only, for expenses; making it unlawful to appropriate or pay any further sum to legislators to defray their expenses on attendance on a session (MACKINTOSH, C. J., FRENCH, PARKER and ASKREN, JJ., dissenting).

Application filed in the supreme court February 3, 1927, for a writ of mandamus to compel the state auditor to issue a warrant. Denied.

*Judson F. Falknor, Charles W. Hall, Samuel R. Buck, Joseph H. Griffin* and *Ward Hunt,* for relator.

*The Attorney General* and *E. W. Anderson, Assistant,* for respondent.

TOLMAN, J.—Relator, who is a member of the house of representatives of the present legislature, seeks by this proceeding a writ of mandate requiring the state

[1]Reported in 253 Pac. 805.

auditor to issue to him a warrant for $105, payable
from the moneys appropriated for the expenses of
the present session of the legislature by chapter 1 of
the Laws of 1927, p. 5. It is alleged and admitted by the
return that relator is such member; that he has been
in attendance upon the legislative session from Jan-
uary 10 to January 30, 1927, inclusive; that the house
has passed a resolution which reads:

"Resolved, by the House of Representatives of the
State of Washington:

"That the sum of five dollars ($5.00) be allowed to
each member of the House of Representatives, for each
day of the twentieth session of the legislature of the
state of Washington for expenses incurred in attending
the session of the legislature at the state capital, and
that the speaker and the chief clerk be and they are
hereby authorized to make out the necessary vouchers
upon which warrants for the same will be drawn, the
said sums to be paid out of moneys appropriated for
the expenses of the twentieth legislature;"

that a voucher for twenty-one days at five dollars per
day, totaling one hundred five dollars, has been regu-
larly issued to the relator, which voucher respondent
has refused to recognize. The return further

". . . alleges that the relator, E. F. Banker, has
been paid as a member of the house of representatives
of the state of Washington all remuneration and reim-
bursement to which he is lawfully entitled for the
period from January 10, 1927, to January 30, 1927, both
dates inclusive; that he has been paid for his services
the sum of five dollars per day for each day's attend-
ance upon sessions of the legislature during said period
and that he has also been paid mileage at the rate of ten
cents for every mile of travel in going to and returning
from the place of meeting of the legislature on the most
usual route."

Chapter 1, Laws of 1927, is the ordinary and usual
act appropriating the amount therein specified for the

purpose of paying the expenses of the twentieth legislature of this state.

[1] Relator seems first to contend that the appropriating act, being a valid and constitutional enactment, the court should not look behind nor beyond that act in determining whether or not the legislature has acted lawfully in providing for the expenditure of the money so appropriated. If we understand what is meant by this contention, we cannot give it our sanction. The appropriating act provides money for the expenses of the legislature, and if either house, or both acting concurrently, shall attempt by any means to withdraw and apply any part of the moneys so appropriated to another and foreign or forbidden purpose, such attempt can be reviewed by the courts in a proper proceeding. So here, we think the resolution must be construed with the appropriating act, and both taken together are in legal effect the same as though there were written into the appropriating act a proviso in the language of the resolution, thereby directing that of the moneys appropriated a portion shall be used to pay each house member five dollars for each day of the session for expenses incurred in attending the session at the state capitol. In other words, we hold that the act and resolution when construed together, as they must be, show an attempt to withdraw money, appropriated for legislative expenses, for the personal use and benefit of the individual members of the house, and unless the legislature has the power to pay such individual expenses, the relator must fail. We assume that each house, acting alone, may declare, fix and allow its own proper expenses, so no point is made of the fact that the resolution here in question is not concurred in by the senate.

[2] The real question here to be determined is whether or no the legislature, or either house thereof,

has the power under our constitution to provide for the payment to individual members of expenses incurred by them in attending its session at the state capitol.

The only provision of our constitution which we have found necessary to be considered in answering the question is § 23, article II, which reads:

"Each member of the legislature shall receive for his services five dollars for each day's attendance during the session, and ten cents for every mile he shall travel in going to and returning from the place of meeting of the legislature, on the most usual route."

In approaching a construction of this provision of the constitution, we must bear in mind all of the rules to be applied to constitutional construction, among which are: (1) That the constitution is a limitation of power and the legislature is supreme, except as its power is limited by the constitution. *Walker v. Spokane*, 62 Wash. 312, 113 Pac. 775; *Standard Oil Co. v. Graves*, 94 Wash. 291, 162 Pac. 558. (2) In construing the constitution words are to be given their ordinary meaning. *Bronson v. Syverson*, 88 Wash. 264, 152 Pac. 1039. (3) All doubts or ambiguities are to be resolved in favor of the constitutionality of an act of the legislature. *State ex rel. Reclamation Board v. Clausen*, 110 Wash. 525, 188 Pac. 538; *Nipges v. Thornton*, 119 Wash. 464, 206 Pac. 17; *State ex rel. Mullen v. Howell*, 107 Wash. 167, 181 Pac. 920; *State ex rel. Carroll v. Superior Court*, 113 Wash. 54, 193 Pac. 236. Also (4) the well settled and often applied rule generally expressed by law writers about as follows:

"In construing a constitution, resort may be had to the well recognized rule of construction contained in the maxim *expressio unius est exclusio alterius*, and the expression of one thing in a constitution may necessarily involve the exclusion of other things not expressed; but this rule, like all other mere rules of con-

struction applied to ambiguous words, must yield to proof of surrounding facts and circumstances which satisfactorily demonstrates that the meaning intended by the parties was different." 6 R. C. L. 49. See, also, 12 C. J. 707.

And last, but not least, (5) uniformity of construction.

"A cardinal rule in dealing with constitutions is that they should receive a consistent and uniform interpretation, so that they shall not be taken to mean one thing at one time and another thing at another time, even though the circumstances may have so changed as to make a different rule seem desirable. In accordance with this principle, a court should not allow the facts of the particular case to influence its decision on a question of constitutional law, nor should a statute be construed as constitutional in some cases and unconstitutional in others involving like circumstances and conditions. Furthermore, constitutions do not change with the varying tides of public opinion and desire. The will of the people therein recorded is the same inflexible law until changed by their own deliberative action; and therefore the courts should never allow a change in public sentiment to influence them in giving a construction to a written constitution not warranted by the intention of its founders." 6 R. C. L. 46.

There are, of course, no words of express limitation in § 23 of article II, and it is our duty to determine what was meant by those who drew the provision nearly forty years ago. Relator earnestly contends that its authors meant that the legislature should receive five dollars per day and ten cents per mile as compensation, while the respondent just as earnestly contends that five dollars per day was intended as compensation for services, and the mileage was intended as an allowance for expenses. If the first construction be the correct one, then, as the constitution allowed nothing for expenses, the rule of *expressio unius est exclusio alterius* does not apply, and the legislature may properly act in

the matter, but if the respondent is right and the constitution allows ten cents per mile as expenses, the *exclusio* rule does or may apply, and, if it does, the power of the legislature is thereby limited. Neither construction is so ungrammatical as to cause its rejection, and we must look to other rules for guidance. Compensation in the most common and ordinary use of the word means pay, but it also includes restitution or a balancing of accounts, so that the title words of the section may cover both pay for services and the repayment of amounts expended. The framers of the constitution must have had in mind the conditions which then existed. This was then a territory about to be admitted into the sisterhood of the states. It was traversed from east to west by but one line of railroad. Many of the legislators then coming from the northeasterly and the southeasterly portions of the new state might and would have to travel many miles by stage or private conveyance before they could reach a line of railway, and then perhaps four hundred or more miles of railway travel to reach the seat of government. Days would be consumed in the journey. Not only were railway fares then high, but stage fares were perhaps higher per mile traveled, meals and lodgings must necessarily be procured along the way, and it seems reasonable to suppose that with their knowledge of the then conditions the framers of the constitution honestly believed that, in many cases at least, the legislators would be put to an actual expense equal to ten cents for every mile traveled both coming and going; and it is not to be presumed that they saw in that allowance any overage which could be retained by the individual legislator, except perhaps some few who came from the most favored localities. The constitution does not use the word mileage, but the words used on this subject can

be aptly defined by no other term than mileage, and we do not hesitate to hold that mileage was what was intended. Mileage in 1889, when the constitution was adopted, meant and now means an allowance for traveling expenses at a certain rate per mile. See, Webster's Unabridged Dictionary and Webster's New International Dictionary.

Speaking to a similar question, the supreme court of the United States in *United States v. Smith,* 158 U. S. 346, said:

"The first item relates to the allowance of the claim for mileage. While an allowance for travel fees or mileage is, by section 823, included in the fee bill, we think it was not intended as a compensation to a district attorney for services performed, but rather as a reimbursement for expenses incurred, or presumed to be incurred, in traveling from his residence to the place of holding court, or to the office of the judge or commissioner. The allowance of mileage to officers of the United States, particularly in the military and naval service, when traveling in the service of the government, is fixed at an arbitrary sum, not only on account of the difficulty of auditing the petty items which constitute the bulk of traveling expenses, but for the reason that officers travel in different styles; and expenses, which in one case might seem entirely reasonable, might in another be deemed to be unreasonable. There are different standards of traveling as of living, and while the mileage in one case may more than cover the actual expenses, in another it may fall short of it. It would be obviously unjust to allow one officer a certain sum for traveling from New York to Chicago, and another double that sum, and yet their actual expenses may differ as widely as that. The object of the statute is to fix a certain allowance, out of which the officer may make a saving or not as he chooses, or is able. And while, in some cases, it may operate as a compensation, it is not so intended, and is not a fee, charge, or emolument of his office within the meaning of section 834. It is much like the arbitrary allowance for the attendance

of witnesses and jurors, which may or may not be sufficient to pay their actual expenses, depending altogether upon the style in which they choose to live.''

We are convinced that the allowance of ten cents per mile was intended as mileage to cover the expense of going to and from the state capitol, and in no sense as pay for the services of the legislature.

This view, if it needs further support, is greatly strengthened by other provisions of our constitution relating to the salaries of public officers. The system of fees which had largely prevailed theretofore, by reason of which a popular belief had grown up that many public officers were unduly profiting by virtue of their office, was absolutely abolished and set aside. Fees and contingent perquisites were made impossible, and it was clearly the intention to fix all compensation to officers in definite amounts which should be well known, and to thus prevent any further contingent or unknown profit to any officer. In view of all the conditions then existing and the manifest intent of the authors of the constitution to cure what was generally believed to be a prevalent evil, it seems past possible argument that they fully intended that legislators should receive five dollars per day only for their services, ten cents per mile only for expenses, and be strictly forbidden further allowances for either services or expenses. We have so construed other provisions with reference to other officers. In *State ex rel. Stratton v. Maynard,* 35 Wash. 168, 76 Pac. 937, there was involved the right of a state officer to receive fees in addition to the salary fixed by the constitution. It was there said:

''Conceding the contention of the respondent that existing laws are not to be changed by the adoption of the constitution, except as far as they may be inconsistent with its provisions, we are of the opinion that the provisions of the territorial act are in conflict with

the provisions of the constitution, in relation to the compensation of the attorney general, and that the constitution sought, in § 21, *supra,* to prescribe the compensation for such officer. The language of the constitution appears to us so plain that it seems scarcely susceptible of construction, but, if construction be resorted to, there are two rules of construction which must be applied and which, it seems to us, are controlling: (1) If the intention of the lawmaking power is plainly discernible from the language employed, the law must be construed in accordance with such manifest intention, without the aid of other rules of construction; for the object of all canons of construction is to aid in properly arriving at the intention of the framers of the law in question; (2) a constitution being adopted by the votes of the common people, its language must be particularly construed in accordance with the common understanding of the words and language employed; although, if there were no difference in the rule of construction employed in interpreting constitutional and legislative enactments, it would be equally clear to us that the contention of the respondent could not be maintained. For we think it is plain, not only from the language used, but from the connection of the language with other provisions of the constitution, that it was the intention of the framers of the constitution that the attorney general should be fully compensated by the salary prescribed. . . .

". . . The fact must not be lost sight of that the main office of a state constitution is to limit legislative power, and it is too evident for discussion that a limitation on the compensation to be allowed the attorney general was sought to be imposed in § 21, when it said 'He shall receive an annual salary of $2,000, which may be increased by the legislature, but shall never exceed $3,500 per annum.' We must not impute to the framers of the constitution the commission of so foolish and vain an act as that of prescribing a limitation which, in effect, is no limitation at all; for while, under the construction contended for, the legislature was limited to prescribing a salary not exceeding $3,500, it could in-

directly, through the medium of fees allowed, increase indefinitely the amount of pay allowed the officer. It was the compensation of the officer which was the material thing with which the constitution was dealing; in plain phrase, the amount of money which the state would have to pay out of its treasury for his services. Whether that amount should be paid out under the term 'compensation,' 'salary,' or 'fees' was unimportant.

"It is said that the constitution nowhere provides that the compensation of the attorney general shall be fixed by salary; that it provides what his salary shall be, but does not fix his compensation. This contention is answered by what we have said above, viz., that it was the compensation to which the constitution was prescribing a limit. . . ."

The language and the spirit of that decision is nearly, if not quite, decisive of this case. But let us look further. Relator quotes at length from, and relies upon, cases from other states as supporting his contention. In *Russ v. Commonwealth*, 210 Pa. St. 544, 60 Atl. 169, 105 Am. St. 825, 1 L. R. A. (N. S.) 409, were involved expenses sought to be allowed legislators while attending certain ceremonies as a committee representing the state. Such allowance was thought to be in violation of a constitutional provision forbidding additional compensation. As we read the decision, it holds that the legislators acted as a committee representing the state, just as any other committee authorized by the legislature might have done, and therefore the compensation received was as members of such a committee, and not as legislators. If our construction is right, the case is clearly not in point. A question almost exactly similar to our own was presented in *State ex rel. Weldon v. Thomason*, 142 Tenn. 527, 221 S. W. 491, except that the constitutional provision there controlling actually read as relator contends ours should read. As given in that opinion, that provision is:

"The sum of $4 per day and $4 for every twenty-five miles going to and returning from the seat of government shall be paid the legislators as a compensation for their services."

Much that is said in that opinion cuts both ways, but, in the light of the difference in the constitutional provisions, we think it unnecessary to further analyze the case.

Relator's main reliance seems to be placed upon *Christopherson v. Reeves,* 44 S. D. 634, 184 N. W. 1015, and it is indeed an authority for his position, if persuasive enough to convince us. We have carefully considered the case, and to us it seems to violate the fundamental rule hereinbefore quoted from 6 R. C. L.:

"Constitutions do not change with the varying tides of public opinion and desire. The will of the people therein recorded is the same inflexible law until changed by their own deliberative action."

In this connection, we are not unmindful of the present hardships which legislators endure, nor of the public good to be accomplished by making it possible for poor men to serve the state. Perhaps, in a doubtful case, these considerations might be given some weight; but convinced as we are of the meaning of our constitution, we see no relief except to change the constitution in the manner therein provided.

Lack of time and space forbids a review of the authorities upon which respondent relies. Some are based upon constitutional provisions like our own, and some upon constitutional provisions which expressly forbid further allowances or perquisites. But if our constitution, by the application of the rule, *expressio unius est exclusio alterius,* impliedly, forbids such allowances, which we now unhesitatingly declare it to do, then the limitation is just as strong and just as controlling as if expressed in apt words. So that such cases are

equally authority for our position. Among the cases which we think fully support our views are: *Fergus v. Russel,* 270 Ill. 626, 110 N. E. 887; *In re Opinion to Governor,* 90 Fla. 708, 107 So. 366; *Ashton v. Ferguson,* 164 Ark. 254, 261 S. W. 624; *State ex rel. Griffith v. Turner,* 117 Kan. 755, 233 Pac. 510; *State ex rel. Fox v. Raine,* 49 Ohio St. 580, 31 N. E. 741; *In re Opinion to Governor,* 35 R. I. 166, 85 Atl. 1056.

The Kansas and Arkansas cases are especially strong, and we think in large measure answer the argument of relator based upon the supposed construction of the constitution by the official furnishing to the legislators of postage, stationery, pens, pencils, and the like, which has been done ever since statehood. If anything need be added, it is only to point out that these things have been furnished and paid for by the state, that they remained state property until consumed in the process of carrying on the state's business, and are no more than the procuring of like supplies for the use of every other department of the state government. Surely no one will contend that the secretary of state, or any other like constitutional officer, should pay for the postage of his office, or if the state furnishes him postage for the needs of his office that it should likewise furnish him living expenses. The necessary and ordinary practice of furnishing to members the supplies for use in the performance of their official duties furnishes no precedent for the action now under consideration.

The unfortunate plight of the legislators is by no means a new condition. It has existed to a greater or less degree for at least a decade, and yet, apparently believing that the constitution forbade, no previous action of this kind has ever been attempted. This, we think, indicates that previous legislatures have entertained the views which we have herein endeavored to

express and adds to our confidence in the correctness
of our position.

Being clearly convinced that our constitution by im-
plication forbids the payment to members of the legis-
lature of anything further than those emoluments
therein named, we are strongly of the opinion that the
resolution in question does not provide for the pay-
ment of legislative expenses, but that it does attempt
to allow funds to members to be used at will. The
writ is therefore denied.

FULLERTON, BRIDGES, MAIN, and MITCHELL, JJ., con-
cur.

MACKINTOSH, C. J. (dissenting)—In the absence of
constitutional inhibition, the legislature has the right
to provide for reimbursement of the expenses incurred
by its members in attending the legislative sessions.

The question, then, is whether the constitution of
this state contains such an inhibition. The only pro-
vision in reference to this subject is that contained in
§ 23, article II, which provides that each member of the
legislature shall be paid for his services a certain *per
diem* and "ten cents for every mile he shall travel in
going to and returning from the place of meeting of
the legislature." As I read this section, it in clear
language provides that the ten cents a mile and the
five dollars a day are to be paid to the legislators *for
their services;* making this purely a constitutional pro-
vision for salary and having no reference to the ques-
tion of reimbursement for expenses. So reading the
section, there is nothing therein contained which pro-
hibits the legislature from making provision for such
reimbursement. The most that the respondent can
logically claim for this section is that its meaning is
uncertain and that it is subject to two constructions.
The rule recognized by the majority opinion and uni-

versally applied is that, under such circumstances, an act by the legislature which is questioned as to its constitutionality is to have its interpretation arrived at by resolving all doubts and ambiguities in favor of its validity. It therefore appears to me that, whether you view the section of the constitution as one providing for services only, or whether the other view is taken— that the section is indefinite and uncertain—the same result must be arrived at, to wit, the sustaining of the action of the legislature in providing for reimbursement. This interpretation is not only demanded by well-settled legal principles, but has the sanction of the public good and necessity.

For these reasons, I must dissent.

FRENCH, PARKER, and ASKREN, JJ., concur with MACKINTOSH, C. J.