[No. 259.    Decided July 17, 1891.]

A. F. MILLS v. THE STATE OF WASHINGTON, on the Relation of J. R. Smith, Mayor.

QUO WARRANTO — INTEREST OF RELATOR — MUNICIPAL CORPORA-
TIONS — POWERS OF MAYOR PRO TEM.

Under the statutes of this state (Code 1881, § 702, et seq.), relating to information in quo warranto proceedings, the mayor of a city has no interest in the office of city councilman sufficient to entitle him to appear as relator in such proceedings to oust an alleged usurper of that office.

Under the act of March 9, 1891, providing that the number of councilmen in cities of the third class shall be increased from six to seven, and authorizing the mayor or mayor *pro tem.*, on or before June 15, 1891, with the consent and approval of the council to appoint the additional member, a mayor *pro tem.*, duly elected and lawfully acting, has authority to make such appointment, although such appointment may be long prior to the time limited by law, and the mayor may be within the corporate limits of the city at the time.

### *Appeal from Superior Court, Clarke County.*

*Quo warranto* on the relation of J. R. Smith, mayor of the city of Vancouver, Washington, in his official capacity, to oust from the office of city councilman of the city of Vancouver the appellant, A. F. Mills. Vancouver is a city of the third class, organized under Laws 1889–90, p. 131. By the amendatory act of March 9, 1891, the number of councilmen for such city was enlarged from six to seven, and the act provided that "the mayor or mayor *pro tem.* shall, on or before the 15th day of June, 1891, with the consent and approval of the city council, appoint an additional member as provided for by this section." On the 30th day of March, 1891, prior to the adjourned meeting of the city council to be held on that day, the mayor, J. R. Smith, filed with the clerk of the council the nomination of W. H. Brewster as councilman at large. The council met the same day, in pursuance of a former resolution of adjournment from the regular meeting on the 16th of March, 1891, and the mayor of the city being absent, they proceeded regularly to elect one of their members, L. M. Hidden, as mayor *pro tem.*, and after considering the nomination of W. H. Brewster, made by the relator, rejected the same. The mayor *pro tem.* then presiding, was requested to fill the vacancy in the office of seventh or additional councilman, and the mayor *pro tem.* thereupon nominated the appellant, A. F. Mills, who was thereupon elected by a vote of four to two, the mayor *pro tem.* voting in favor of his appointment. On

the next day A. F. Mills duly qualified as councilman. During the whole of this meeting the mayor was absent from the place of meeting, but was present within the corporate limits of the city. Demurrer to the complaint was overruled; and an answer and agreed stipulation of facts having been filed, the court rendered judgment upon the pleadings and stipulation in favor of relator. From the decision on the demurrer and from this judgment defendant appeals.

*W. Byron Daniels,* and *Williams & Wood* (*S. B. Linthicum* with them on the brief), for appellant.

*Wiswall & McCredie,* for appellee.

The opinion of the court was delivered by

DUNBAR, J.—This case presents to our consideration two questions: *First,* Does the complaint show that the respondent has sufficient interest in the office claimed to have been usurped, to entitle him to appear as relator in an information in *quo warranto* proceedings? *Second,* Did the mayor *pro tem.,* by and with the consent of the city council, have the power to appoint the additional councilman? The law involved in these propositions was presented so ably and concisely by counsel on the respective sides that the court has been greatly aided in its investigations. It seems hardly necessary, for the purpose of this investigation, to consider the history of the writ, or of the information in the nature of *quo warranto,* further back than the statute of Anne (9 Anne, c. 22), when the proceeding by information, which had before been a criminal proceeding, became the means of determining civil rights between private parties, and the rights which could before be investigated only through the interposition of the writ of *quo warranto.* Under that statute any one could prosecute the usurper of an office simply by leave of the court. The

practice then soon obtained to allow informations almost
as a matter of course. "Indeed," says Mr. High, in his
Extraordinary Legal Remedies, § 605, "to such an extent
had the granting of these informations been carried that
it was often deemed prudent not to show cause against the
rule *nisi*, lest the respondent should thereby disclose his
grounds of defense." It finally became noticeable that
the remedy was abused, and used for the gratification of
personal malice, and the courts again began to exercise
their rights under the statute of Anne, and would not allow
the information to be filed unless it appeared that the re-
lator had some interest in the matter. The discretion of
the court had to be appealed to in each instance. So far
there can be no difference of opinion, but from this on there
are some distinctions claimed by both parties. For in-
stance, it is claimed by the appellee that there is a distinc-
tion in the necessary interest of the relator where the action
is brought to disenfranchise the corporation, or take its
life, and where it merely goes to the administration of cor-
porate functions; and authorities are cited which seem to
establish this distinction. No doubt, in reason, a greater
interest in the relator should be required where the life of
a corporation is at stake, and where the public would suffer
by its destruction, than where a simple functional power
is called in question; though it may be said in this con-
nection that our statute does not recognize this distinc-
tion. See § 702, subd. 1, Code. On the other hand, it is
contended that while, under the statute of Anne and of kin-
dred statutes, where the discretion of the court is to be
exercised, the private individual or tax-payer may file the
information, yet in statutes similar to ours, where courts are
divested of this discretion, that the rule is changed, and the
information must be filed by the state's officer, or, if filed by
the private individual, that he must show some special inter-
est in the subject of the controversy; and that the cases

cited by appellee, all being cases either under the common-law rule or in compliance with the requirements of the statute of Anne, are not in point. After a careful consideration of the authorities and cases cited, we are inclined to adopt this view.

In *Murphy v. Farmers' Bank*, 20 Pa. St. 415, the court in rendering the opinion says the substance of the statute of Anne had been adopted before the Revolution as a part of the common law, and was a part of the law in Pennsylvania, and that the practice of the court was not affected by the statute of 1836. Mr. High had special reference to the statute of Anne, and to the discretion of the court, in § 681, cited by appellee, where he says:

"The statute of Anne extended the remedy by *quo warranto* information, which had before been considered much in the nature of a prerogative one, to private citizens desiring to test the title of persons usurping or executing municipal offices and franchises, and rendered any person a competent relator in such proceedings who might first obtain leave of the court to file an information."

*State ex rel. Mitchell v. Tolan*, 33 N. J. Law, 195, was tried under a statute giving discretion to the court to allow or reject the filing of the information. The judgment in *State ex rel. Richards v. Hammer*, 42 N. J. Law, 435, was based upon the same ground; and the court, in discussing this question, says:

"All that the court requires in such instance is to be satisfied that the relator is of sufficient responsibility," etc.

In *Churchill v. Walker*, 68 Ga. 681, leave of the court had first to be obtained. In *Com. ex rel. Yard v. Meeser*, 44 Pa. St. 341, the statute was the same, and even with that statute the court reluctantly sustained the case by reason of some special act; for after expressing its reluctance, the court says:

"We observe that by the act of 24th April, 1854, § 3 (not cited to us in arguing these disputes, and not before

noticed by us), any tax-payer may obtain an injunction against any violation of the charter law of the city, and we may take this as a fair analogy for granting this writ."

And then the court adds, "especially as we can always prevent the abuse of it by the exercise of discretion," etc. Thus it will be seen that the practice of allowing private individuals, who are not specially interested, to interfere with the public officers of the state is bottomed on the idea of the discretion of the court, and that the court can restrain any abuse that might otherwise flow from allowing irresponsible parties to make the state a party to their petty troubles and personal likes and dislikes. And the appellee seems imbued with this idea, for he says in his brief:

"It is important that we bear in mind that any evils that might arise from permitting the writ to issue at the instance of a private relator are properly and sufficiently guarded, since it can issue only in the sound discretion of the court."

But we look in vain for any discretion given to the court by our statute. The common law on that subject has been supplanted by the statute—the state has legislated on the subject—and it is to the statute we must look, not only for the practice of the court, but for the qualifications of the relator. Section 702 provides that "an information may be filed against any person or corporation in the following cases" (subsequent subdivisions reciting the cases). Section 706 provides that "whenever an information is filed, a notice signed by the relator shall be served and returned as in other actions. The defendant shall appear and answer, or suffer default, and subsequent proceeding be had as in other cases." There is no discretion given to the court, and, if discretion should be given to the court, the discretion should not go beyond the statutes. The statutes specify those who have the legal right to invoke

this remedy.    If the relator has a standing here, it must
be under § 703, which is as follows:

"Sec. 703.    The information may be filed by the prose-
cuting attorney in the district court of the proper county,
upon his own relation, whenever he shall deem it his duty
to do so, or shall be directed by the court or other compe-
tent authority, or by any other person, on his own relation,
whenever he claims an interest in the office, franchise or
corporation which is the subject of the information."

The legislature has looked out for the interests of the
public by providing that the information shall be filed by
the prosecuting attorney, either on his own relation, or
when directed by the court or other competent authority;
and private interests are provided for in the latter part of
the section by the words, "or by any other person on his
own relation." When? When he "claims an interest in
the office, franchise or corporation which is the subject of
the information." What interest is meant? Surely not
an interest in common with other citizens, for the protec-
tion of that interest is already provided for in the first part
of the section.    If the statute is to be construed as having
any meaning at all, and if words are to be given their ordi-
nary meaning, and the ordinary grammatical construction
is given to the language and sentences, it must mean that
the interest must be a special interest, not common with
the interests of the community.    Section 705 confirms this
view:

"Sec. 705.    Whenever an information shall be filed
against a person for usurping an office, by the prosecuting
attorney, he shall also set forth therein the name of the per-
son rightfully entitled to the office, with an averment of
his right thereto; and when filed by any other person he
shall show his interest in the matter, and he may claim the
damages he has sustained."

Thus it will be seen that when the information is filed
by the prosecuting attorney in the interests of the public,

those interests need not be shown, but when filed by any other person he shall show his interest in the matter, and he may claim the damages he has sustained. What possible damages could the mayor be entitled to in this case? Or what damages could any one be entitled to who had no interest separate from the common interest of the public?

The following sections: "Sec. 707. In every case wherein the right to an office is contested, judgment shall be rendered upon the rights of the parties, and for the damages the relator may show himself entitled to, if any, at the time of the judgment. Sec. 708. If judgment be rendered in favor of the relator, he shall proceed to exercise the functions of the office, after he has been qualified as required by law, and the court shall order the defendant to deliver over all books and papers in his custody, or within his power, belonging to the office from which he has been ousted. Sec. 710. When judgment is rendered in favor of the plaintiff, he may, if he has not claimed his damages in the information, have his action for the damages at any time within one year after the judgment,"—all convey the idea that where the relator is other than the prosecuting attorney he must show his interest, and will be entitled to damage if he prevail, showing conclusively that his interest must be a special interest, and that his damage would be equally distinct. It is not alleged in the complaint that the relator is even a tax-payer, so that the cases cited on that question are not in point, even if the law of this state should be construed to permit a taxpayer to become a relator in such case. He appears simply claiming the interest of a mayor. It is difficult to see what interest the mayor has in the office of a city councilman that any other citizen has not. He is interested in the rightful administration of the laws, but so is every other citizen. If he be a tax-payer he is interested in an economical administration, but so is every other tax-payer in the

city. It may be fairly presumed that he is an influential citizen, and commands the esteem and confidence of his fellow-townsmen, but this does not give him any additional legal interest in the city government. So far as the remarks of Judge Dillon (1 Dill. Mun. Corp., 4th ed., § 13, cited by the court below in its very able opinion) are concerned, they might be profitably considered by a legislative body, but certainly can be of little assistance to a court in construing a statute. Judge Dillon was indulging in a statement of what he thought the law should be; the province of the court is narrower—it is to ascertain what the law is. Inasmuch as the statute seems to tolerate but one construction, it appears hardly worth while to specially review the authorities cited by appellant. We have examined them, and they bear out his contention. It is true that in *Miller v. Town of Palermo,* 12 Kan. 14, as cited in appellant's brief, the relator sought to have the corporation dissolved; but the judgment of the court seemed to be based on the general proposition that, if the injury is one that particularly affects a person, he has a right to the action; if it affects the whole community alike, their remedy is by proceedings by the state through its appointed agencies. It is contended by the appellee that, under our system of government, where the people have so prominent a part in the filling of offices, to prevent an interested citizen from applying for a writ of inquiry, excepting by the consent and in the name of the prosecuting attorney, is going far towards the practice of governments where kings and kingly officers do the governing. But the very fact that under our system of government the people have so prominent a part in the filling of the offices, is an answer to the objection, as it places in their hands a remedy for any abuse that might grow up under the system. The ancient writ of *quo warranto* was exclusively in the interest of the king, and the subject had no right to invoke it at all. Its

office was to inquire into the usurpation of, and to protect, the prerogatives of the crown; but he who draws a parallel between the use of a legal remedy exercised by the ancient kings for the benefit of the crown, and a remedy exercised by public officers under our system of government for the benefit of the public, fails to discriminate between a monarchical and republican form of government. Ours is purely a representative government; the government is the people, and the prerogative of the government is a prerogative of the people; and the public prosecutor represents and acts for the people, and is responsible to the people alone for his office. The representatives of the people, in exercising their legislative discretion, have not deemed it proper, or to the best interest of society, that grievances of a public character, affecting the whole community alike, should be investigated at the suit of a private individual, but through the agency of a public officer, who represents and has in charge the interest of the whole community. This principle is not confined to this particular remedy, but is applicable to the law governing the enforcement of other rights. Whether the legislation be right or wrong, the statute on the subject of information will bear no other construction or interpretation than that embodied in this general statement, that if the injury is one that is peculiar to the individual he has his right of action, but if it affects the whole community alike, the remedy is by proceedings by the state through its appointed agencies.

As to the second proposition, it seems to us there can be but little controversy. The appointing power is given by the proviso to § 4 of the amendatory act of 1891, and is as follows:

"*Provided*, That the mayor or mayor *pro tem.* shall, on or before the 15th day of June, 1891, with the consent and approval of the city council, appoint the additional member," etc.

There is no greater power conferred by this section on

the mayor than there is on the mayor *pro tem.;* either one could, with the consent of the council, make this appointment any time before the 15th day of June, 1891. The only question is, was Hidden properly acting as mayor *pro·tem.* at the time the appointment was made? If he was, the power to appoint was conferred upon him by the statute, and it is not questioned that he was at such time a lawfully acting mayor *pro tem.* It is made the duty of the mayor to preside at all meetings of the council; and the law provides that in case of his absence the council may appoint a mayor *pro tem.* It matters not what the cause of the mayor's absence was, or whether he was in the city or out of it; he was absent from the meeting of the council, and this was the only fact the ascertainment of which was necessary by the council to authorize the appointment of a mayor *pro tem.* The demurrer to the information should have been sustained.

It follows that the judgment is reversed, and the case remanded to the lower court with instructions to proceed in accordance with this opinion.

ANDERS, C. J., and STILES, HOYT, and SCOTT, JJ., concur.