[No. 31939. *En Banc.* September 2, 1952.]

THE STATE OF WASHINGTON, *on the Relation of Hugh H. Evans, Prosecuting Attorney for Spokane County, Respondent,* v. THE BROTHERHOOD OF FRIENDS, *Appellant.*[1]

[1] Reported in 247 P. (2d) 787.

*Joseph L. Thomas, Joseph A. Albi,* and *Ennis & Herman,* for appellant.

*Hugh H. Evans* and *John J. Lally,* for respondent.

*Frederick A. Clanton, Donald Simpson, James M. Ballard, Chavelle & Chavelle, Cornelius C. Chavelle, Edward J. Lehan,* and *Charles C. Ralls, amici curiae.*

FINLEY, J.—This appeal involves a *quo warranto* proceeding. It was initiated by the prosecuting attorney for Spokane county in compliance with a writ of mandate, issued by the superior court of that county. Specifically, the purpose of the proceeding is to determine whether slot machines of the usual type, more particularly described hereinafter, may be operated by The Brotherhood of Friends, a corporation or "club," organized under the laws of the state of Washington as a nonprofit, benevolent, educational, fraternal, athletic, or social variety. The trial court entered a judgment of ouster and enjoined the operation of the slot machines by The Brotherhood of Friends in the club premises or quarters in the city of Spokane. The corporation, The Brotherhood of Friends, has appealed.

The significant questions involved are:

(1) Whether there was a legal basis or justification for the initiation and prosecution of the *quo warranto* proceeding by the county prosecuting attorney; or stated somewhat differently, can the county prosecuting attorney challenge the constitutionality of Laws of 1937, chapter 119, p. 468, Rem. Rev. Stat. (Sup.), §§ 2472-1 and 2472-2, RCW 9.47.040, 9.47.050 (hereinafter referred to as chapter 119), in this *quo warranto* proceeding? (Chapter 119 penalizes possession, use, or operation of slot machines as a felony, but attempts to exempt or immunize nonprofit clubs as defined thereunder.)

(2) a. Does Art. II, § 24, of the Washington constitution, prohibit the legislature from authorizing lotteries of any or all kinds and varieties? or does the section constitute merely a prohibition of "chartered" or "ticket" lotteries as these

were known and operated in 1889, when the state constitution was adopted?

b. Is a slot machine (of the type involved in the case at bar) a lottery?

(3) Was the appellant corporation entitled to rely upon chapter 119? and is the corporation immune from attack in this *quo warranto* proceeding because chapter 119 has not previously been declared unconstitutional? Stated somewhat differently, are the acts of the corporation in operating the slot machines violative of state criminal statutes requiring or justifying a judgment of ouster enjoining operation of the slot machines?

Succinctly stated, we are convinced that all of the above questions must be answered adversely to the claims of appellant, and that the judgment of the trial court must be affirmed.

This case was presented to the trial court on an agreed statement of facts. The Brotherhood of Friends was incorporated on January 11, 1935, as what is commonly regarded as a nonprofit, benevolent, educational, fraternal, athletic, or social club. It apparently has approximately 8,600 members, ostensibly in good standing. The corporation owns and operates club quarters in Spokane, Washington. When this action was instituted, appellant was operating fifty-five slot machines. There were four 50-cent machines, twenty-six 25-cent machines, nine 10-cent machines, and sixteen 5-cent machines. Members and guests are entitled to use the club facilities.

The slot machines are mechanical devices of the usual variety, operated with coins of the United States of the denominations indicated above. A coin is inserted in a slot. The player pulls and releases a lever. This actuates three wheels or drums in the machine, causing them to revolve rapidly for a matter of seconds. A variety of symbols are imprinted or painted upon the outside surfaces of the revolving wheels or drums. The internal mechanism stops the revolving drums, and the symbols on each of the wheels line up in parallel designs or patterns, several of which are visible under a glass viewplate on the front of the machine.

When certain combinations are thus lined up, the machine may return nothing, or, *automatically*, it may award from three to eighteen coins to the player. Additional special awards are received by a player when the symbols line up in either a so-called "jack pot" combination or a "B.O.F." (Brotherhood of Friends) award, or combination. These special awards are not paid automatically by the machine. They are paid by someone in charge of the machines at the time the particular combinations of symbols are lined up behind the glass viewplate. Such awards are paid out of the general funds of The Brotherhood of Friends. The general funds are made up of receipts from all sources of revenue of the club, including receipts from all slot machines operated by the club.

The mechanism of the various machines is set, or the general scheme for their operation is so worked out, ostensibly covering both the automatic and the special awards, so that ninety-five per cent of the coins inserted by the players of all the machines, as an over-all general proposition, are returned to the various players of the machines. This does not mean that every player receives back ninety-five per cent of all that he puts into a machine. The amounts received by some players are obviously greatly in excess of the amounts inserted by them into the machines. Quite as obviously, the amounts returned to other players are less than the amounts inserted into the machines by them. In other words, stated simply, some players win money; many other players lose money in playing the slot machines.

Appellant's gross operating income from its slot machines is taxed both by the state of Washington and the city of Spokane. Up to and including the 28th day of February 1951, appellant has paid the sum of approximately $849,-627.72 in taxes to the state of Washington, and the sum of approximately $102,301.72 to the city of Spokane in taxes regarding the operation of the slot machines. Approximately the sum of $28,540.33 has been paid to the United States government in license fees upon the slot machines. On the basis of these tax figures, in the *amicus* brief supporting the prosecuting attorney's position in this matter, it is

estimated that more than twenty million dollars has been put through the machines by club members and others. There are more than two hundred so-called nonprofit clubs or organizations operating slot machines in this state. (Parenthetically, we are inclined to observe that on the basis of the foregoing statistics the aggregate slot machine play in our state over the past several years must run into astronomical figures.)

Appellant has made rather large contributions to recognized charitable organizations, including the sum of approximately $105,000, contributed by it to the Spokane Memorial Stadium Fund. Recreational, dining, and dancing facilities are maintained by appellant for the benefit and enjoyment of its members and guests. The club holds a class "H" license from the Washington state liquor control board. Guest privileges are extended in accordance with the rules and regulations of that board.

Mention should be made of the facts relative to the initiation of the *quo warranto* proceedings by the prosecuting attorney of Spokane county. Three resident citizens, taxpayers of Spokane county, applied to the superior court of that county for a writ of mandate directing the prosecuting attorney to bring an action in *quo warranto* against The Brotherhood of Friends. In their application, the petitioners alleged that they had demanded of the prosecuting attorney that he institute an action in *quo warranto* against The Brotherhood of Friends, contesting its right as a corporation to do business and to operate slot machines, but that the prosecutor had refused to proceed, as demanded, on the ground that chapter 119 permitted the operation of slot machines in clubs such as the one operated by The Brotherhood of Friends. It was further alleged by petitioners that the operation of slot machines by The Brotherhood of Friends constituted corporate acts amounting to misuser of its corporate franchise, subjecting the corporation to ouster and injunction against the further operation of the slot machines. The petitioners alleged that chapter 119 was unconstitutional, and conferred no immunity or privileges up-

on The Brotherhood of Friends to operate slot machines in its corporate club or in any other capacity.

In the mandamus action (cause No. 128,775, State ex rel. Noel C. LeRoque, John Finney, Jr., and Joe Wilkening, versus Hugh Evans, Spokane county prosecuting attorney), the prosecuting attorney filed a demurrer. It was overruled, and the prosecutor was ordered to institute *quo warranto* proceedings in accordance with the application and the relief sought by the petitioners. In compliance with the order of the superior court, the prosecuting attorney promptly instituted cause No. 31939, the instant *quo warranto* proceedings, and therein, as indicated heretofore, the trial court entered a decree of ouster, enjoining and prohibiting The Brotherhood of Friends from operating the slot machines. The case has now reached this court on appeal.

Appellant contends that the prosecuting attorney had no authority to institute the *quo warranto* proceedings. More specifically, it is argued that the prosecutor's interest in the matter did not justify nor provide a proper basis for institution of the action; that the power and authority of his office were insufficient and did not permit him to attack the constitutionality of chapter 119; that The Brotherhood of Friends relied in good faith upon chapter 119 for permission and authority to operate the slot machines; that the particular legislation should be presumed to be constitutional until declared otherwise; and that such presumption immunized the corporation respecting its challenged conduct, namely, the operation of the slot machines.

We cannot agree with appellant. The *quo warranto* proceeding is based upon Rem. Rev. Stat., § 1034, RCW 7.56.010, the pertinent language of which reads as follows:

"An information may be filed against any . . . corporation in the following cases:— . . .

"5. Or where any corporation do or omit acts which amount to a surrender or a forfeiture of their rights and privileges as a corporation, or where they exercise powers not conferred by law."

Rem. Rev. Stat., § 1035, RCW 7.56.020, provides:

"The information may be filed by the prosecuting attor-

ney in the superior court of the proper county, upon his own relation, whenever he shall deem it his duty to do so, *or shall be directed by the court or other competent authority,* . . ." (Italics ours.)

Consideration of the above statutes in connection with the fact in this case that the prosecuting attorney was specifically ordered to initiate the *quo warranto* proceedings by the superior court (which order, incidentally, was not appealed), clearly obviates any discussion as to whether the prosecuting attorney had a proper interest in the matter. The pertinent question relates not to the right or interest of the prosecutor and the exercise of discretion by him. The sole question is whether the superior court properly exercised its discretion under the aforementioned statutes. If there were any lingering doubts as to this aspect of the case, most certainly they are laid at rest by *State ex rel. Gilbert v. Prosecuting Attorney,* 92 Wash. 484, 490, 159 Pac. 761, wherein this court said:

"It is clear that the legislature conceived that cases might arise in which the prosecuting attorney might not 'deem it his duty' to file the information, yet in which the rights involved might be of such public moment as to make it essential that they be determined by the court after a full trial on the law and the facts. Hence the legislature provided that the information may be filed by the prosecuting attorney, not only whenever he deems it his duty to file it, but also whenever he 'shall be directed by the court or other competent authority.' Appellant argues that the use of the word 'may' in the opening line of the statute has a permissive significance and vests a final discretion in the prosecuting attorney. But this cannot be so unless we strike from the statute the clause last quoted. On the contrary, when that clause is considered it is clear that the word 'may' is used, not in the permissive, but in the alternative sense. That is to say, the information *may* be filed *either* at the instance of the prosecuting attorney *or* of the court. *Clearer terms than those of the statute could hardly be framed to deny a final discretion to the prosecuting attorney and vest an ultimate discretion in the courts.* The statute neither says nor implies that the court may direct the prosecuting attorney to act only when that officer has fraudulently or corruptly refused to act. It distinctly reposes the final discretion in the court, regardless of the attitude or motives of the prosecuting attorney.

"The question is no longer an open one in this state." (Italics ours.)

In the same case, we further stated, and most emphatically:

"We are clear that, under our statute, the superior court has the ultimate discretion to order the prosecuting attorney to file the information. . . . As pointed out in *Mills v. State ex rel. Smith*, 2 Wash. 566, 27 Pac. 560, 'the common law on that subject has been supplanted by the statute,' and again:

" 'The legislature has looked out for the interests of the public by providing that the information shall be filed by the prosecuting attorney, either on his own relation, or when directed by the court or other competent authority; and private interests are provided for in the latter part of the section by the words, "or by any other person on his own relation." '

"Moreover 'this statute is remedial and must be liberally construed.' *State ex rel. Attorney General v. Seattle Gas & Elec. Co.*, 28 Wash. 488, 493, 68 Pac. 946, 70 Pac. 114." (Italics ours.)

■ We note particularly, and emphasize, the last sentence above quoted from the *Gilbert* case. We reiterate that Rem. Rev. Stat., § 1034, is remedial, and must be liberally construed.

■ We do not think it makes any difference in this case that the action of the prosecuting attorney does involve an attack by him upon the constitutionality of chapter 119. Frankly, we think it was his duty and responsibility to test the constitutionality of the statute, particularly in view of the serious questions of substantial public interest involved in the matter. We know of no law enforcement official in this state who could more properly be expected to institute an action of the kind here involved.

The policy inherent in our above remarks and in our disposition of this important aspect of the case is substantially supported by statements found in decisions from other jurisdictions. Some of such cases involve *quo warranto* or another type of proceeding. In some of them the state attorney general rather than the county prosecutor was involved.

In all of the cases, the principle or policy involved is the same; namely, the right of the chief law enforcement officer (a) of a county, or (b) of a state, to question the constitutionality of an act of the legislature. In *Louisiana v. Washburn*, 177 La. 27, 147 So. 489, the county attorney questioned the constitutionality of a legislative act in a criminal prosecution. On appeal his action was sustained. In *Wilentz v. Hendrickson*, 133 N. J. Eq. 447, 33 A. (2d) 366, 375, the court sustained the right of the attorney general of the state of New Jersey to question the constitutionality of an act of the legislature. Speaking in terms of principle or policy, the court said at p. 457:

"Moreover, as a matter of public policy, measures to test the legality of proceedings reasonably believed to be in violation of the fundamental law of the state, should be liberally granted. *Gimbel v. Peabody*, 114 N. J. Law 574, 577; 178 Atl. Rep. 62.

"The information in the present cause was properly filed by the Attorney-General by virtue of the inherent authority of his office."

Commenting upon this principle, the supreme court of the state of Florida said in *State ex rel. Landis v. S. H. Kress & Co.*, 115 Fla. 189, 198, 155 So. 823:

"If the action taken by the Attorney General is construed to be an attack upon the constitutionality of the foreign-corporation-permit statutes we hold that it is within his power as the judicial officer of the Executive Department to do so.

"If the power exists, it is not a question of right in him to institute the necessary proceeding when in his opinion a condition exists which requires the exercise of the power. *It is a matter of duty.* . . .

"The attack by the Attorney General upon the constitutionality of the Act is within the powers of that office, and was so recognized in *State, ex rel. Ellis, Attorney General, v. Bryan, et al., supra* [50 Fla. 293, 39 So. 929]." (Italics ours.)

We are convinced that there was no abuse of discretion by the trial court in issuing a writ of mandamus directing the county prosecutor to initiate the *quo warranto* proceedings.

■■ The presumption that an act of the legislature is constitutional is purely and simply a rule of statutory interpretation, properly usable under certain circumstances by the courts in determining the meaning and interpretation of statutes. The appellant can take no refuge in this rule of statutory interpretation if in the final analysis a statute is found to be unconstitutional by a court of competent jurisdiction. If a statute is unconstitutional, it is and has always been a legal nullity. The point is so well established that it should require no citation of supporting authorities. Appellant, The Brotherhood of Friends, acquired no immunity by reason of the presumption of constitutionality, and acquired no rights or standing under chapter 119, assuming the act is unconstitutional.

In *Norton v. Shelby County*, 118 U. S. 425, 442, 30 L. Ed. 178, the United States supreme court, speaking through the eminent Mr. Justice Field, said:

"An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed."

In 53 A. L. R. 269, § III, the general rule is stated as follows:

"In the majority of jurisdictions it is held that reliance on a statute which subsequently is declared unconstitutional does not protect one from civil or criminal responsibility for an act in reliance thereon, which would otherwise subject him to liability."

In *Drum v. University Place Water District*, 144 Wash. 585, 589, 258 Pac. 505, we referred to the above-mentioned principle, as enunciated in *Norton v. Shelby County, supra*, saying:

" ' . . . and, being unconstitutional, it is as ineffectual and inoperative as though it had never been passed. *Norton v. Shelby County*, 118 U. S. 425 (6 Sup. Ct. Rep. 1121). It was no law, and the claim of legislative recognition of appellant as a municipal corporation is therefore without foundation, and must fall.' *Denver v. Spokane Falls*, 7 Wash. 226, 34 Pac. 926."

In view of the foregoing discussion, we must conclude that the Spokane county prosecuting attorney acted properly and validly in commencing and prosecuting the *quo warranto* proceeding. Appellant's assignments of error Nos. I, II, and XII, relating to this phase of the case, are in our judgment not meritorious.

Now as to whether our state constitution prohibits any or all lotteries of any or all kinds and type whatsoever, or is limited in effect to a prohibition of chartered or ticket lotteries, as the latter were known in 1889 when our constitution was adopted. Washington Constitution, Art. II, § 24, provides:

"LOTTERIES AND DIVORCE.—The legislature shall never authorize any lottery, or grant any divorce."

Appellant contends that chartered or ticket lotteries had a very pernicious history at the time of the adoption of our state constitution, and strongly urges that Art. II, § 24, above quoted, was written into the constitution solely to outlaw chartered or ticket lotteries. We are asked to construe this constitutional provision strictly in the light of facts and circumstances claimed by appellant to have existed in 1889. It is claimed these facts indicate that the outlawing of chartered or ticket lotteries must have been the sole purpose involved in the enactment of Art. II, § 24.

Appellant is only partially on sound ground. An article by A. R. Spofford, "Lotteries in American History," published in the annual report of the American Historical Association (1892), 4 Senate Misc. Documents 173, indicates that the operation of lotteries was widespread and flourished in the United States throughout most of the nineteenth century. They appear to have been an accepted phenomenon from early colonial times. They were used to raise funds to build churches, colleges, to construct roads, to assist in defraying the expenses of various governmental activities. Desirable objects and results were intermingled with most devious and reprehensible ones, the latter involving graft. corruption, chicanery, venal fraud, and outright crime. The lusty development of the lottery system may be illustrated

by some statistics relative to the city of Philadelphia, where, in 1809, there were three offices for the sale of lottery tickets; in 1827, there were sixty such offices; in 1831, the number was 177; and in 1833, there were more than two hundred offices. In the year 1832, ticket sales in Philadelphia aggregated approximately fifty-three million dollars, involving around 420 lottery schemes being operated in various parts of the United States. In the 1870's, the Louisiana State Lottery, the Cheyenne Lottery, the Wyoming Prize Distribution Lottery, the Laramie City Lottery, the Victoria, Canada, Lottery, the Havana, Kentucky, Madrid, and the Royal New Brunswick lotteries, exerted baleful influence over thousands of victims and throughout the body politic in this country. (See May, 1949, issue, American Bar Journal.) Even a casual reference to the history of lotteries in this country indicates the widespread operation of chartered or ticket lotteries, particularly during the 1800's.

■■ However, we cannot agree with appellant's contention that Art. II, § 24, of our state constitution applies only to chartered or ticket lotteries. In the first place, we feel most strongly that the language of this constitutional provision *is not ambiguous.* The provision is phrased in the broadest and most sweeping terms. It prohibits *any* lottery. We believe the word "any," given its usual meaning, is all embracing as far as different types and kinds of lottery schemes and devices are concerned. Clearly, its meaning seems to us to be the equivalent of the terms *all* or *every.* It is a cardinal principle of judicial review and interpretation that unambiguous statutes and constitutional provisions are not subject to interpretation and construction. Essentially, appellant's argument is that the applicable language of Art. II, § 24, is ambiguous; that resort to interpretation consequently is indicated and permissible; and finally, as mentioned above, that the phrase "The legislature shall never authorize any lottery" must be interpreted in the light of facts and circumstances existing in 1889.

Assuming only for the purpose of argument that the meaning of the constitutional provision is subject to some

ambiguity, we still cannot agree with the interpretation of the language as suggested by appellant. If the framers of our constitution intended to prohibit only chartered or ticket lotteries, it would have been a very simple matter to have said so in so many words, limiting the prohibition precisely to chartered or ticket lotteries. Quite obviously, they did not do so. Appellant cites *State ex rel. Clithero v. Showalter*, 159 Wash. 519, 522, 293 Pac. 1000, in support of the contention that the applicable language of Art. II, § 24, must necessarily be interpreted in the light of contemporary facts and circumstances. A careful anaylsis of the *Showalter* case does not support this contention. The strongest pertinent statement in the case appears to be from 6 R. C. L. 46, § 39, to the effect that:

" 'A cardinal rule in dealing with constitutions is that they should receive a consistent and uniform interpretation, so that they shall not be taken to mean one thing at one time and another thing at another time.' "

and that

" '. . . .constitutions do not change with the varying tides of public opinion and desire.' "

Generally speaking, we agree with this sweeping generalization that consistency in the interpretation of constitutional provisions is desirable. The quoted language from the *Showalter* case was taken from *State ex rel. Banker v. Clausen*, 142 Wash. 450, 253 Pac. 805. In the *Clausen* case, a constitutional provision was under consideration after it had previously been interpreted in *State ex rel. Stratton v. Maynard*, 35 Wash. 168, 76 Pac. 937. Obviously, the principle announced in the *Clausen* case and reiterated in the *Showalter* case was, as pointed out above, to the effect that consistency in the interpretation of constitutional provisions is a desirable judicial objective. Article II, § 24, has not been interpreted heretofore by this court in the manner suggested by appellant.

Contemporary facts and circumstances unquestionably should and must be accorded great weight and serious consideration, but judicial interpretation of statutes and

constitutions is not entirely limited to such a narrow and restricted approach.

In *McCulloch v. Maryland,* 4 Wheat. 316, 407, 4 L. Ed. 579, 601, we find the classic statement by Chief Justice Marshall:

"A constitution, to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of the prolixity of a legal code, and could scarcely be embraced by the human mind. It would, probably, never be understood by the public. Its nature, therefore, requires, that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects, be deduced from the nature of the objects themselves . . . In considering this question, [of the extent of Congress' powers] then, we must never forget that it is a *constitution* we are expounding."

And a further significant statement at p. 415, to the following effect:

"This provision [for the powers of Congress] is made in a constitution, intended to endure for ages to come, and consequently, to be adapted to the various *crises* of human affairs."

To the same effect see Justice Story's opinion in *Martin v. Hunter,* 1 Wheat. 304, 4 L. Ed. 97, 103.

In *State ex rel. Linn v. Superior Court for King County,* 20 Wn. (2d) 138, 146 P. (2d) 543, we said at p. 145:

"Constitutions are designed to endure through the years, and constitutional provisions should be interpreted to meet and cover changing conditions of social and economic life . . .

" 'Although the meaning or principles of a constitution remain fixed and unchanged from the time of its adoption, a constitution must be construed as if intended to stand for a great length of time, and it is progressive and not static. Accordingly, it should not receive too narrow or literal an interpretation, but rather the meaning given it should be applied in such a manner as to meet new or changed conditions as they arise.' 16 C. J. S., Constitutional Law, pp. 49-50, § 14."

We think that in Art. II, § 24, the framers of our state constitution intended to outlaw all lotteries. The policy

inherent in the provision is a broad one, aimed not at specific kinds or types of lotteries operated by means of tickets, roulette wheels, or involving other particular methods of operation. While charter or ticket lotteries constituted a widespread evil—and the draftsmen may have had such clearly in mind—other types and kinds of lotteries did exist in 1889, and prior thereto. As a matter of fact, the courts of this country had been confronted with numerous types of lottery other than the chartered or ticket lotteries prior to the time Art. II, § 24, was drafted and adopted. *Negley v. Devlin*, 12 Abb. Prac. (NS) 210 (NY 1872), concert hall, similar to theatre "bank night"; *Hull v. Ruggles*, 56 N. Y. 424 (1874), gift enterprise conducted with merchandise; *Crews v. State*, 38 Ind. 28 (1871), distribution of prizes by sale of envelopes; *Chavannah v. State*, 49 Ala. 396 (1873), wheel of fortune; *State v. Clark*, 33 N. H. 329, 66 Am. Dec. 723 (1856), gift sale of books; *Holoman v. State*, 2 Tex. App. 610 (1877), prizes in candy boxes.

In 1898, the constitutional provision relating to lotteries was considered by this court in *Seattle v. Chin Let*, 19 Wash. 38, 52 Pac. 324. At that time, § 139 of the penal code of the state of Washington outlawed lotteries, but contained the following exception:

"Provided, that nothing herein contained shall apply to any lotteries for charitable purposes."

At p. 40, of the *Chin Let* case, the court stated:

"Appellant urges that this proviso conflicts with art. 2 of § 24 of the constitution of the state, . . . The language of the constitution is mandatory and the provision is self-executing. The question naturally suggests itself, if lotteries for charitable purposes may be lawfully conducted and permitted, why may not lotteries for any other purpose? *We think that the constitutional provision admits of no exception in favor of lotteries for charitable purposes or for any other purpose.*" (Italics ours.)

Now as to the question of whether a slot machine is a lottery. We have analyzed from other jurisdictions far too many decisions relative to this question to attempt to cite and quote them all. These have involved the inter-

pretation of (a) state statutes, (b) state constitutional provisions, or (c) both. All of the large group of cases to which we refer have involved the question of whether slot machines are included within the definition of the term "lottery." The overwhelming weight of authority is to the effect that slot machines as here involved and of the usual type and variety are lotteries. In 54 C. J. S. 853, § 8, under title "Lotteries," we find the following general statements:

"While the authorities are not unanimous, it is generally held that the operation of devices such as slot machines and wheels of fortune constitutes a lottery; but the operation of a machine for amusement only, no prizes being awarded, is not a lottery.

"Although the contrary view has been taken, by the weight of authority the operating of slot machines, wheels of fortune, or similar devices whereby small amounts are hazarded on the chance of winning a larger sum or value, constitutes a lottery, *regardless of the name by which they are called or the method of operating them,* and even though the prizes are distributed according to a regular order, or the player is informed before each operation thereof what such operation will distribute, or is assured of an ordinary return for his money, in addition to the chance of securing a prize. However, the operation of machines which, although similar to pinball games, are played for amusement purposes only, with no prize available to players, does not constitute a lottery." (Italics ours.)

*Johnson v. State,* 137 Ala. 101, 34 So. 1018 (Ala.), wheel of fortune; *Meyer v. State,* 112 Ga. 20, 37 S. E. 96 (Ga.), nickel slot trade machine; *Crews v. State,* 38 Ind. 28, sale of envelopes—money in few; *Commonwealth v. Lake,* 317 Mass. 264, 57 N. E. (2d) 923 (Mass.), "Rotary Merchandiser"; *State v. Globe-Democrat Publishing Co.,* 341 Mo. 862, 110 S. W. (2d) 705 (Mo.), cartoon puzzle contest; *State v. Lowe,* 178 N. C. 770, 101 S. E. 385 (N. C.), merchandise vending machine; *Flemming v. Bills,* 3 Ore. 286, mechanical dice game; *Queen v. State,* 93 Tex. Cr. 173, 246 S. W. 384 (Tex.), gum vending machine with prizes; *Chavannah v. State,* 49 Ala. 396 (1873), wheel of fortune.

We are impressed by the decision of the Montana supreme

court in *State v. Marck,* 124 Mont. 178, 181, 220 Pac. (2d) 1017, wherein, among other things, the court said:

"The scheme here involved by the use of the slot machines was for the disposal and distribution of money by chance. Each player drops a United States coin in the slot of a mechanical device, then pulls a lever setting in motion the wheels and other mechanism of the machine, and waits until the wheels cease revolving for the chance of obtaining thereby and therefrom more coins than he contributed. *Such scheme is clearly a lottery."* (Italics ours.)

In passing, we refer to a further interesting comment by the Montana court in the *Marck* case (p. 181):

"The purchase from or issuance by the state board of equalization of a revenue or license stamp for each slot machine is no justification for the criminal offense of setting up, maintaining, operating or possessing these one-armed bandits."

The question of whether slot machines are lotteries is extensively discussed in two 1938 decisions of the supreme court of Oregon, *State v. Coats,* 158 Ore. 122, 74 P. (2d) 1102, and *State v. Coats,* 158 Ore. 102, 74 P. (2d) 1120. At p. 133 of the first above-mentioned case, the court said:

"According to the weight of authority the operation of slot machines and similar gambling devices, whereby small amounts are hazarded on the chance of winning larger sums, constitutes lotteries."

Particularly as to the element of chance and the possible factor of skill or judgment, the court further stated in this case (p. 132):

"Three things are necessary to constitute a lottery, viz, prize, chance and consideration: . . . [citing cases] *If any substantial degree of skill or judgment is involved, it is not a lottery.* Of course, all forms of gambling involve prize, chance and consideration, *but not all forms of gambling are lotteries.* A lottery is a scheme or plan, as distinguished from a game where some substantial element of skill or judgment is involved. *Poker, when played for money, is a gambling game but, since it involves a substantion amount of skill and judgment, it cannot reasonably be contended that it is a lottery.* In the instant case the mechanical device is the means of carrying into execution the illegal

scheme or plan. Tested by the legal principles above stated, we are convinced that the mechanical device described in the information constitutes a lottery." (Italics ours.)

We are in substantial agreement with the above indicated reasoning of the Oregon court.

In the case at bar, it is contended that the slot machines may be distinguished from lotteries because the former are operated by only one player at a time. That is a half truth which does not stand up very convincingly upon analysis. Obviously, a single machine is so constructed that it is normally operated by one individual at a time. But each machine is a part of the over-all operation of the other machines in The Brotherhood of Friends Club. One player's loss constitutes a definite contribution to the general funds of the club; another player's winnings, certainly in so far as the so-called "jack pot" and "b.o.f." awards are concerned, constitute a distribution from the club's general funds. Thus, each machine is tied in with the operations of all other machines. While this is a significant aspect of the slot machine operations of The Brotherhood of Friends Club, it is not necessarily the controlling factor. In other words, we do not mean to say that a machine, operated solely by itself without relation to other machines, could not constitute a lottery of some smaller magnitude in and of itself.

In appellant's brief much is made of the fact that ninety-five per cent of the coins inserted in the slot machines are returned to the players, and that only five per cent of such funds are mechanically retained by the machines for the use and benefit of the club. This is another apparently significant fact, but upon analysis, it seems at best a superficially diverting half truth. If each player continued to feed coins into the same automatic machine for a certain time or until a certain total amount had been inserted, it may be conceivable that ninety-five per cent of the coins inserted would be returned to that player, and five per cent retained by the club. It would not seem a rash assumption for us to take note of the practical facts of life by observing that seldom, if ever, is it to be expected that the machines would be operated by players in the precise fashion just described.

Players come and go. In all probability, the club quarters are closed at some periods. Various machines break down. Others are out of play—certainly while the club's five per cent "take" is being removed from them.

■ We are firmly of the opinion that slot machines of the variety here involved, their operation—singly and collectively—are mechanical lotteries. The machines constitute mechanical devices which dispense with the necessity of tickets and salesmen, and possibly, other details—mechanical or otherwise—which are generally necessary in the operation of lottery schemes or plans. *The scheme or plan involved, rather than any mechanical device employed, constitutes the gist of the question, and determines whether a particular operation constitutes a lottery.*

■ We think appellant's assignments of error Nos. III-VIII, inclusive, and X, relating to the constitutional aspects of this case, are not meritorious. It is our judgment that the attempted exemption as to clubs, contained in chapter 119, is in direct conflict with Art. II, § 24, of the Washington constitution, and the statute in that respect is hereby held to be unconstitutional.

Prior to the enactment of chapter 119, the possession of slot machines, specifically, was made a gross misdemeanor under Rem. Rev. Stat., § 2472. The legislative history of the legislation now known as chapter 119 indicates that its initial purpose, unquestionably, was the *banishment of slot machines.* Section 1 of the original draft of Senate Bill No. 212 read as follows:

"The operation of slot machines has become an evil business, lending itself to attempts to corrupt public officials and other crime. Moreover, the promoters of the slot machine business seek to entice children by deliberately placing machines near to school houses. Therefore, it is hereby declared that the policy of the State of Washington is to banish slot machines and obvious substitute devices."

This very striking purpose or policy, so clearly set forth and stated in the original drafts of the proposed legislation, was eliminated from the draft as finally enacted. Chapter 119 did make it a felony to bring into the state, own, or

possess slot machines, but it contained the exemption as to clubs as defined or referred to therein.

In the final analysis, it is questionable whether the purpose of the act was (a) to banish slot machines from the general public under pain of a felony, or (b) to legalize them in private or nonprofit clubs. Prior to the enactment of chapter 119, it must be remembered that Rem. Rev. Stat., § 2472, specifically made it unlawful to have slot machines any place in the state of Washington, and violations thereof were penalized specifically only as misdemeanors. After its enactment, possession and operation of slot machines in clubs was *ostensibly* authorized by chapter 119.

The legislative history of chapter 119 convinces us that the penal provisions, making violations punishable as a felony, would not have been enacted without the attempted exception or immunity relating to clubs as defined in the act. The statute contains no separability provision. It follows that chapter 119 must be considered as a unit or as an inseparable legislative enactment. The entire act, including the exemption as to clubs and its felony penal provisions, is unconstitutional.

In the *quo warranto* proceeding, the prosecuting attorney contends that the act is discriminatory in that the classification relative to clubs, as defined in chapter 119, is not a reasonable one. The argument is that nonprofit corporations similar to The Brotherhood of Friends are subject to no regulation and control unless perchance they hold licenses from the Washington state liquor control board relative to liquor or alcoholic beverages. It is contended that the classification is arbitrary and can in no manner be construed to be regulatory in nature, involving some regulatory purpose reasonably certain of accomplishment. On the other hand, appellant contends that the classification is a reasonable one, that the act is regulatory in nature, that permitting the operation of slot machines in clubs, as distinguished from public places, is in itself a reasonable and effective regulation, and that the requirement for registration of slot machines with the state patrol and sheriff of the counties

where they may be located is essentially regulatory in nature and a proper and purposeful exercise of the police power.

We do not feel that it is necessary to decide the question as to whether chapter 119 is discriminatory in violation of Art. I, § 12, of the Washington constitution, for the reason that we have already held the act unconstitutional and in violation of Art. II, § 24, of our constitution.

The only question that remains is whether or not the acts of the corporation relative to the slot machine constitute violations of provisions of our criminal code, subjecting the corporation to a decree of ouster and an injunction prohibiting further operation of the slot machines.

In his brief, at p. 29, appellant describes the purpose and effect of Rem. Rev. Stat., § 1034, in the following language:

"The authority granted by the statute is plain. If a corporation is operating in violation of the law, it is committing acts which amount to a surrender or forfeiture of its privileges as a corporation. If a corporation exercises powers not conferred by law, its corporate franchise is subject to forfeiture."

 In view of the foregoing statement by appellant, and our decision as to the unconstitutionality of chapter 119, the acts of the corporation clearly are contrary to provisions of Rem. Rev. Stat., §§ 2472, 2469, 2474, 2500, and 2464. This provides a proper basis for the judgment of ouster and the injunction entered by the trial court. *Stone v. Miss.,* 101 U. S. 814, 25 L. Ed. 1079; *State ex inf. McKittrick v. Globe-Democrat Publishing Co.,* 341 Mo. 862, 110 S. W. (2d) 705; *Com. ex rel. Woodruff v. American Baseball Club of Phil.,* 290 Pa. 136, 138 A. 497; and see Annotation, 53 A. L. R. 1038.

Appellant's assignment of error No. IX is without merit. Assignments of error Nos. XIII through XVII, inclusive, are disposed of adversely to appellant by our conclusions reached heretofore, and further discussion of these seems unnecessary.

The judgment of the trial court is affirmed.

SCHWELLENBACH, C. J., MALLERY, HILL, HAMLEY, WEAVER, and Olson, JJ., concur.

GRADY, J. (dissenting)—I am not in accord with the view that gambling by means of a slot machine is a lottery. The majority opinion makes a simple matter quite complicated. The problem presented is readily determined by a consideration of our constitutional and legislative history on the subject of gambling, rather than merely following the ideas expressed by other courts.

The majority opinion points out the existing evils which prompted the framers of the constitution to place an inhibition upon the legislature with reference to a lottery by § 24 of Art. 2. They had before them § 913 of the Code of 1881, which had been enacted in 1854.

"Sec. 913. Every person who shall sell any lottery tickets, or shares in any lottery, for the division of property to be determined by chance, or shall make or draw any lottery or scheme for a division of property, not authorized by law, on conviction thereof, shall be fined in any sum not exceeding five hundred dollars: *Provided,* That nothing herein contained shall apply to any lottery for charitable purposes."

This legislative provision indicated what was understood to constitute a lottery. It also indicated that a lottery might be authorized by law. It made an exception in cases of a lottery for charitable purposes. The territorial legislature must have considered that a lottery for charitable purposes would not be productive of the evil sought to be prohibited by the legislation. A comparison of the lottery statute and the other statutes relating to various forms of gambling indicates that none of them was embraced in that which was regarded as a lottery. The statute continued to be the law on the subject of lottery until 1909, when the legislature enacted the following:

"A lottery is a scheme for the distribution of money, or property by chance, among persons who have paid or agreed to pay a valuable consideration for the chance, whether it is called a lottery, a raffle, gift enterprise, or by any other name, and is hereby declared unlawful and a public nuisance.

"Every person who contrives, proposes or draws a lottery, or assists in contriving, proposing or drawing a lottery, shall be punished by imprisonment in the state penitentiary for

not more than five years, or by a fine of not more than one thousand dollars, or by both." [RCW 9.59.010.]

After statehood, the legislature from time to time enacted legislation relating to various forms of gambling according as different schemes therefor were devised or invented. The fundamental difference between a lottery and other forms of gambling was always recognized and dealt with separately.

Possession of mechanical devices for gambling was prohibited by § 220 of chapter 249 of the Laws of 1909 [RCW 9.47.030].

"Every person who has in his possession or permits to be placed or kept in any building or boat, or part thereof, owned, leased, or occupied by him, any table, slot machine, or any other article, device or apparatus of a kind commonly used for gambling, or operated for the losing or winning of money or property, or any representative of either, upon any chance or uncertain or contingent event, shall be guilty of a gross misdemeanor."

It seems to me it would require a stretch of the imagination to say that this statute has any aspect of a lottery as such form of gambling was understood by the framers of the constitution or the legislature when enacting legislation on that subject.

It is my view that purchasing a chance on a lottery is far different than putting a coin in a slot machine. In the lottery, a large number of tickets are sold and the prize to the winner is a sum of money or other property. All of the ticket holders have a common interest in the objective. When all tickets are sold, there is a drawing and the one who holds the number of the one drawn gets the prize. In the case of the slot machine, a person puts a coin into it through an aperture and pulls a lever or like device. He may receive a sum of money or its equivalent. Usually he gets nothing. At irregular intervals the mechanism causes the machine to yield. My mind rebels against the idea that a slot machine is a lottery.

It may be that good public policy warrants prohibition of all forms of gambling. It is a well known fact that many

people indulge in playing slot machines and other forms of gambling at a financial sacrifice. However, any social, economic, or moral problem involved is for the legislature to solve by appropriate legislation. It is within the province of the legislature to authorize or prevent the use of gambling devices. The wisdom and policy with reference to such activity is highly controversial. There has always been a substantial segment of our population which desires to gamble in some form, and the legislature is frequently importuned by individuals and groups thereof to relax gambling laws and make exceptions in their coverage. Success was achieved by securing the passage of chapter 119 of the Laws of 1937 (RCW 9.47.040-050). By this enactment, organizations like appellant were authorized to own slot machines so that their members might have access to and might have opportunity to operate them. Another relaxation of gambling laws was chapter 55, Laws of 1933 (RCW 67.16.060), relating to horse racing.

The decisions of the courts in the various states which have had occasion to pass upon the question of whether gambling by use of a slot machine is a lottery are in conflict. Which line of cases constitutes the "weight of authority" is largely a matter of individual opinion. I think it was the intention of the framers of our constitution to deal with the question of a lottery separate and distinct from other forms of gambling. The fact that they placed an inhibition upon the legislature to authorize any lottery but did not place such inhibition with reference to other forms of gambling is persuasive to me that they had in mind the form of gambling by a lottery that was then in vogue and had been productive of many evils. To cite, quote from, and discuss the cases holding that a slot machine is not a lottery would serve no useful purpose in a dissenting opinion, and hence I refrain from so doing.

DONWORTH, J., concurs with GRADY, J.

October 29, 1952. Petition for rehearing denied.