IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 37838-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JERRY WAYNE CLARK, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Jerry Wayne Clark appeals his conviction of second degree assault for strangling his stepfather. He argues the trial court abused its discretion by allowing a medical expert to testify in a manner that required the jury to speculate whether his stepfather's injuries were caused by strangulation. Because Clark did not object on this basis at trial, we decline to review this purported error.

Clark also argues, and the State concedes, that resentencing is required because his two convictions for possession of a controlled substance should not be included in his offender score. We remand for resentencing.

FACTS

On March 9, 2020, Larry Michael McFarland and his wife, Gloria Richardson, returned to their Spokane home after dinner. McFarland and Richardson's adult son, Jerry Wayne Clark, exchanged hostile words. Clark punched McFarland in the face two or three times. McFarland fell on the floor, and Clark got on top of him and put his hands around McFarland's throat. Clark said, "I'm going to kill you, I'm going to kill you." Report of Proceedings (RP) at 137; *see also* State's Ex. 10 at 4 min., 5 sec.[1] McFarland told Clark to get off him, and he became dizzy. Richardson yelled at her son until he got off McFarland, and Clark then left. During the altercation, Richardson's hand was injured.

Richardson called the police. The responding officers found McFarland in a state of shock with visible injuries on his face and marks on his neck. The officers photographed McFarland's injuries. Medics assisted McFarland at his home. He went to the hospital at some point following the incident and had trouble communicating with the doctors.

---

[1] State's Exhibit 10 is the bodycam footage from the police officer who interviewed Richardson on the night of the incident.

*Trial court proceedings*

The State charged Clark with second degree assault by strangulation against

McFarland (count 1) and fourth degree assault against Richardson (count 2). Both crimes

carried the domestic violence family or household member enhancement as defined by

RCW 26.50.010(6).

*Expert testimony on strangulation*

The State sought to call registered nurse Cassandra Klakken Viramontes to testify

on the effects of strangulation. Clark objected, arguing: (1) the expert testimony will not

be helpful to the jury because most people are familiar with the concept of strangulation,

(2) strangulation is an element of the charged crime so testimony on that topic would

invade the province of the jury, and (3) in the alternative, the State provided no

information on the established scientific methodology behind the proposed testimony, so

a *Frye*[2] hearing is necessary.

The court ruled that Nurse Klakken's testimony was admissible under ER 702.

Its written order read, in part:

> [The] Court finds that the information provided by the state does not require
> a separate hearing to determine Ms. Klakken's credentials as an expert.
> [ER] 702 is broad in its allowance of admitting expert witness[es] if the
> court believes that it will assist the trier of fact. A qualified expert may

---

[2] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

testify in the form of an opinion. It is possible that this testimony will assist the trier of fact. Generally, the public will know some symptoms of strangulation such as raspy voice or sore throat, however there are technical aspects and/or symptoms to blocking the flow of breath and/or blood such as petechia [sic] that the trier of fact may not be aware of. Admittance of testimony is still subject to prior foundation being laid as an expert and defense counsel may question qualifications. . . .

Clerk's Papers (CP) at 35.

### Trial

The State called five witnesses.

### Larry Michael McFarland

McFarland testified that he did not remember what happened before the incident, but remembered Clark "came at" him when he and Richardson arrived home from dinner. RP at 135. He said, "[Clark] hit me in the face" with a closed fist. RP at 135. Clark is "a lot bigger" than McFarland, who is 72 years old. RP at 136. After Clark hit him, McFarland said: "I hit the floor, and he had got on top of me and strangled me." RP at 136. Clark used enough pressure to "put bruises on the side of [his] neck." RP at 137. McFarland was able to breathe and see while Clark's hands were around his neck. Although McFarland could not see Richardson, he said Clark got off him due to his wife's intervention.

After Clark left, McFarland could not stand up to call the police. He does not remember how long he laid on the floor. When he got to the hospital, he "couldn't talk at all." RP at 145. He "probably" could not remember everything that happened that night, although he had memory problems before that evening. RP at 139. His doctors said he "had a couple strokes" after the incident. RP at 141. His balance is off, and he falls down a lot. These problems were all diagnosed after the incident.

On cross-examination, the defense inquired further about the effects of the incident. The following exchange took place:

> [DEFENSE COUNSEL:] . . . Would you be surprised if the medical records said you did not have a stroke?
> [MR. McFARLAND:] Yeah, very surprised since I had—according to the doctor at Deaconess, I had some bleeds where I had my strokes. I took medicine for that to stop the bleeding.
> . . . .
> [DEFENSE COUNSEL:] There's no mention of this incident in those records. I believe your prior testimony was that you had some problems documented from this incident, . . . would you be surprised that there is no reference to this incident—
> [MR. McFARLAND:] Yeah—

RP at 143-44. McFarland again stated that he could breathe and see during the incident and did not have bloodshot eyes afterward, only some bruises.

*Responding police officers*

Officer Adam Anderson responded to the scene that evening. He testified: "When I saw Mr. McFarland, the first thing I noticed was that he had dried blood around his lips, he had a cut or dried blood on—above his right eye, and it looked like an abrasion on his right cheek." RP at 46. When there was more light, Officer Anderson "saw some scratch marks around his neck, some red abrasions around his neck similar to if somebody was in a physical altercation of some sort." RP at 47. There were two or three scratch marks on both sides of McFarland's neck. McFarland seemed "a little dazed" and "just kind of shocked." RP at 46. It was difficult to have a conversation with him, and Officer Anderson had to continuously redirect him to get the story. Officer Anderson acknowledged that McFarland's age could have affected his ability to have a conversation.

Officer Anderson had training on injuries related to strangulation and noted that if someone is strangled long enough, they could have abrasions, early signs of bruising on the neck, and bloodshot eyes. McFarland did not appear to have bloodshot eyes.

Officer Vanessa Johnson also responded to the scene. She testified that "the residents inside were visibly shaken or pretty upset." RP at 148. McFarland had "[f]acial trauma" and was obviously bleeding from injuries on his face. RP at 153. Officer

6

Johnson interviewed Richardson inside the home and found her to be very animated like "[s]omething just occurred." RP at 149. Richardson got emotional and cried. She also had an abrasion that was bleeding on the back of her right hand. Richardson was treated by medics that night but did not go to the hospital.

*Gloria Richardson*[3]

Richardson testified that, at the time of the incident, Clark had been living with her and McFarland. She recalled that Clark and McFarland got into a scuffle. She otherwise did not remember much, did not know why certain things happened, and revealed that she had multiple split personality disorder. After her testimony, the State successfully moved to admit bodycam footage of Officer Johnson's interview with her.

The bodycam footage shows Officer Anderson's six-minute interview with Richardson. Richardson said that McFarland went to the kitchen to fix some ice cream. She heard McFarland tell Clark he may need to find another place to go because they were scared of him. Richardson said, "[Clark] got up and spit in my face" and "hit me" on the shoulder. When Clark was fighting with Richardson, McFarland tried to call 911. Clark then took McFarland down on the bathroom floor and was "choking him." Clark

---

[3] As the trial date neared, Richardson said she would not testify. This prompted the State to request and be granted a material witness warrant. Richardson's reluctance to testify against her son explains her sparse testimony at trial.

7

was saying, "I'm going to kill you, I'm going to kill you." McFarland kept saying, "It's okay, I hear you." Richardson jumped on Clark's back to get him off McFarland, and Clark knocked her down. She did not know how long Clark was choking McFarland. *See* State's Ex.10.

### *Cassandra Klakken*

Nurse Klakken is a registered nurse in the emergency department of Holy Family Hospital, a position she has held for 13 years. She has attended numerous trainings, including an advanced training for strangulation and asphyxiation. She holds a certification in emergency nursing. She presents on strangulation to forensic nursing students and teaches a five-hour class on strangulation. The State asked that Nurse Klakken be recognized as an expert, and Clark did not object.

Nurse Klakken follows methodology that is accepted practice in her medical community when she examines someone for strangulation. Other physicians and doctors use the same methods and ask the same questions to determine whether a patient has been strangled.

Nurse Klakken testified that all strangulations are serious because they carry the possibility of lifelong consequences. She explained:

> Depending on the type of injuries that a strangulation victim receives, . . . [t]hey could have memory loss, they could have difficulty with higher

> functioning, so personality changes, time management, injury to the frontal lobe.
>
> There's long-term consequences that could show up years later where there's microclots. So if you think about a person who's had strokes, you would see those same type of physical events later. . . .

RP at 164-65. It can be difficult to determine where a patient's stroke-like symptoms came from.

Nurse Klakken explained that people confuse strangulation with choking. It is difficult to diagnose strangulation because: "More than 50 percent of people who have been strangled don't have any . . . visible injuries." RP at 166. If there are visible signs, they may be marks on the neck. There also may be petechiae, "where the capillaries break open and blood will seep into the tissue." RP at 167-68. This looks like "tiny red spots" on the face, ears, in the mouth, or on the scalp. RP at 168. Some people's capillaries in their eyes rupture. Other symptoms include hoarseness of the voice, intonation change, and swelling.

Nurse Klakken described two types of strangulation: one where force is exerted against the trachea blocking air flow and another where pressure is applied to the lateral sides around the neck blocking blood flow to the brain. The latter type "can cause tearing in the vessels, so it can pool in the neck and create swelling" or "additional bruising." RP at 172. She described the physiology of blood entering and leaving the brain and what

happens when there is a blockage. A person can still speak when their blood flow is blocked as long as their trachea is intact.

On cross-examination, Nurse Klakken explained that with strangulation victims, "[t]here's a list of symptoms, and any of those symptoms could be reported." RP at 184. Vision problems may happen or may not, "It's a crapshoot." RP at 184. Nurse Klakken stated that the prosecution asked her to testify but she knew very little about the case other than it involved an alleged strangulation. She never met Mr. McFarland or any other witness and she had not looked at the medical records, photographs, or police reports. The following exchange took place:

> [DEFENSE COUNSEL:] Okay. So you don't know anything at all about this case, correct?
> [NURSE KLAKKEN:] Correct.
> [DEFENSE COUNSEL:] So you're not in a position to say if there's been strangulation—
> [NURSE KLAKKEN:] No.
> [DEFENSE COUNSEL:] —or what happened or anything like that?
> [NURSE KLAKKEN:] I'm not here to make that determination. These fine folks over here are the ones that's [sic] doing that.
> [DEFENSE COUNSEL:] Okay. But I'm just asking you if you were given any information.
> [NURSE KLAKKEN:] Oh, yeah. No, none at all.

RP at 185. Following Nurse Klakken's testimony, the parties rested their cases.

10

*Jury instructions and closing arguments*

The court instructed the jury that "strangulation" means "to compress a person's neck, thereby obstructing the person's blood flow or ability to breathe, or doing so with the intent to obstruct the person's blood flow or ability to breathe." CP at 58.[4]

In closing, the prosecutor argued that McFarland's symptoms were similar to some of those described by Nurse Klakken:

> [McFarland] said he couldn't get up off the floor. He also testified that he has had certain amount of injuries or cognitive defects since this occurred. Memory, he's had memory problems. He testified to that. He said he didn't have them near as bad until after this occurred. He talked about having stroke-like symptoms. . . . Ms. Klakken testified that, when blood is restricted or breath is restricted, an individual later on may have those kind of symptoms.
> [Nurse Klakken] testified there's no clear way of knowing if those are associated with something else or whether it was strangulation, but she said those symptoms do occur later down the line from strangulation. This happened in March. It is now September. These symptoms, he said, have been occurring since then.

RP at 226-27. The prosecutor then argued that McFarland exhibited petechiae in his eyes and face and told the jury to "look closely" at the photographs of him following the incident. RP at 228.

---

[4] We note that "obstructing" and "obstruct" can imply either full or partial blockage. This issue is not before us.

11

In closing, defense counsel argued there was no medical evidence of strangulation and that Nurse Klakken's testimony did not apply to this situation because she did not "tie anything to this case." RP at 235.

*Verdict and sentencing*

The jury found Clark guilty of second degree assault by strangulation against McFarland and returned a special verdict finding they were members of the same family or household. The jury found Clark not guilty of fourth degree assault against his mother.

Clark agreed to the State's understanding of his criminal history, which included two possession of a controlled substance (PCS) convictions: a February 3, 2014 conviction from Kootenai County, Idaho, and an August 24, 2007 conviction from Spokane County, Washington. Clark's offender score was calculated as 8, resulting in a sentencing range of 53-70 months.

At sentencing, the defense renewed its objection to Nurse Klakken's testimony. The court overruled the objection, stating:

> As it relates to the strangulation expert, I actually learned a lot. I think it did go beyond the scope of the average jury, how can somebody talk like Mr. McFarland when, you know, when they've been choked and the distinction between the trachea not being crushed and the cartilage rings in the throat. So I don't think . . . it was unnecessary window dressing that was very prejudicial. It was very informational. . . .

RP at 269.

The trial court sentenced Clark to a midrange sentence of 61.5 months'

incarceration. He timely appealed to this court.[5]

## ANALYSIS

### EXPERT TESTIMONY

Clark contends the trial court erred in denying his motion to exclude the expert

testimony on strangulation. He argues the testimony, which was general in nature, invited

the jury to speculate that McFarland's mini-strokes were caused by strangulation, thus

resulting in his conviction. We decline to review this purported error.

"A party may assign evidentiary error on appeal only on a specific ground made at

trial. This objection gives a trial court the opportunity to prevent or cure error." *State v.*

*Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007) (citation omitted); *see also*

RAP 2.5(a).

Before trial, Clark objected to the expert witness testimony on three grounds:

(1) the expert witness would not be helpful to the jury because most people are familiar

with the concept of strangulation, (2) strangulation is an element of the charged crime so

---

[5] On appeal, Clark moved to supplement the record with the bodycam footage of Richardson's interview with Officer Johnson. The jury had seen the video but it was not transcribed. A commissioner of this court granted the motion to supplement the record.

testimony on that topic would invade the province of the jury, and (3) a *Frye* hearing is necessary.

Nurse Klakken's testimony provided information about strangulation that even the trial court did not know. For this reason, Clark does not reiterate his first argument on appeal. He raises a new argument: that Nurse Klakken's testimony, which was general in nature, required the jury to speculate that strangulation caused McFarland's mini-strokes.

Trial counsel for Clark could have raised this precise objection at the end of Nurse Klakken's testimony, thereby giving the trial court an opportunity to cure any error. Instead, during closing argument, trial counsel adeptly argued that the jury must find Clark not guilty *because* the State had failed to tie Nurse Klakken's testimony to the case. Rather than objecting to the potential flaw in the expert's testimony, trial counsel used it to her advantage.

Because Clark did not object at trial on the basis he now raises on appeal, we decline to review the purported evidentiary error.[6]

---

[6] Shortly before oral argument, the State raised RAP 2.5(a) for the first time on appeal in a statement of additional authorities. This was improper. A new appeal argument cannot be raised in this fashion. The State subsequently acknowledged this, albeit tacitly, in a supplemental statement of additional authorities, informing this court that *it* has the discretion to raise RAP 2.5(a) sua sponte. Be assured, this panel saw this issue well before oral argument.

RESENTENCING UNDER *BLAKE*

Clark contends he is entitled to resentencing pursuant to *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021). The State concedes this issue.[7]

*Washington PCS conviction*

In *Blake*, our Supreme Court held that Washington's possession of a controlled substance statute is constitutionally invalid. 197 Wn.2d at 186. A prior conviction that is constitutionally invalid on its face may not be considered in a defendant's offender score. *State v. Ammons*, 105 Wn.2d 175, 187-88, 718 P.2d 796 (1986). Under *Blake*, Clark's 2007 PCS conviction from Spokane County, Washington, is invalid and may not be considered in his offender score. The conviction must be struck at resentencing.

*Idaho PCS conviction*

Prior out-of-state convictions may be counted in an offender score if they are comparable to a Washington crime. RCW 9.94A.525(3). This ensures defendants with equivalent convictions are treated equally regardless of whether the prior convictions were incurred in Washington or elsewhere. *State v. Markovich*, 19 Wn. App. 2d 157,

---

[7] The State concedes that Clark's two *Washington* PCS convictions must be struck and therefore does not discuss comparability. Clark has one Washington and one Idaho PCS conviction. Because the breadth of the State's concession is unclear, we fully address this assignment of error.

172-73, 492 P.3d 206 (2021). We review comparability of convictions de novo. *State v. Olsen*, 180 Wn.2d 468, 472, 325 P.3d 187 (2014).

"If a statute is unconstitutional, it is and has always been a legal nullity." *State ex. rel Evans v. Bhd. of Friends*, 41 Wn.2d 133, 143, 247 P.2d 787 (1952). Because Washington's PCS statute "has always been a legal nullity," there is no Washington offense with which to compare Clark's 2014 PCS conviction from Idaho. *See Markovich*, 19 Wn. App. 2d at 173-74 (although *Blake* does not invalidate out-of-state PCS convictions, offender scores including those convictions are inaccurate because they are no longer comparable to a valid Washington offense). Thus, we remand for the trial court to recalculate Clark's offender score without the Washington or Idaho PCS convictions and to resentence Clark.[8]

---

[8] On remand, the State may be able to prove factual comparability to a different Washington statute. However, the State may only rely on "facts that were admitted, stipulated to, or proved beyond a reasonable doubt." *Olsen*, 180 Wn.2d at 478. At resentencing, "both parties have the opportunity to present any evidence relevant to ensure the accuracy of the criminal history." *State v. Jones*, 182 Wn.2d 1, 10-11, 338 P.3d 278 (2014).

No. 37838-1-III
*State v. Clark*

Affirm conviction, but remand for resentencing.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Fearing, J.